# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1.  STATE OF OKLAHOMA;

2.  J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma;

3.  JOHN M. O'CONNOR, in his official capacity as Attorney General of the State of Oklahoma; and

4.  16 OKLAHOMA AIR NATIONAL GUARD MEMBERS,

<em>Plaintiffs</em>,

v.

1.  JOSEPH R. BIDEN, JR., in his official capacity as President of the United States;

2.  SAFER FEDERAL WORKFORCE TASK FORCE;

3.  FEDERAL ACQUISITION REGULATORY COUNCIL;

4.  OFFICE OF PERSONNEL MANAGEMENT;

5.  OFFICE OF MANAGEMENT AND BUDGET;

6.  GENERAL SERVICES ADMINISTRATION;

7.  KIRAN AHUJA, in her official capacity as Director of the Office of Personnel Management and as Co-Chair of the Safer Federal Workforce Task Force;

8.  SHALANDA D. YOUNG, in her official capacity as Acting Director of the Office of Management and Budget and as a member of the Safer Federal Workforce Task Force;

9.  MATHEW C. BLUM, in his official capacity as Chair of the Federal Acquisition Regulatory Council;

10. JEFFREY A. KOSES, in his official capacity as Senior Procurement Executive & Deputy Chief

Civil Action No.: CIV-21-1136-JD

Acquisition Officer, General Services Administration;

11.   LESLEY A. FIELD, in her official capacity as Acting Administrator for Federal Procurement, Office of Management and Budget;

12.   JOHN M. TENAGLIA, in his official capacity as a member of the Federal Acquisition Regulatory Council;

13.   KARLA S. JACKSON, in her official capacity as a member of the Federal Acquisition Regulatory Council;

14.   ROBIN CARNAHAN, in her official capacity as Administrator of the General Services Administration and as Co-Chair of the Safer Federal Workforce Task Force;

15.   JEFFREY ZIENTS, in his official capacity as Co-Chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator;

16.   L. ERIC PATTERSON, in his official capacity as Director of the Federal Protective Service;

17.   JAMES M. MURRAY, in his official capacity as Director of the U.S. Secret Service;

18.   DEANNE CRISWELL, in her official capacity as Director of the Federal Emergency Management Agency;

19.   ROCHELLE WALENSKY, in her official capacity as Director of the Centers for Disease Control and Prevention;

20.   U.S. DEPARTMENT OF DEFENSE;

21.   LLOYD J. AUSTIN III, in his official capacity as Secretary of the U.S. Department of Defense;

22.   U.S. DEPARTMENT OF THE AIR FORCE;

23.   FRANK KENDALL, in his official capacity as Secretary of the U.S. Department of the Air Force;

24.   CHRISTINE WORMUTH, in her official
      capacity as Secretary of the U.S. Department of
      the Army;

25.   U.S. DEPARTMENT OF THE ARMY;

26.   CARLOS DEL TORO, in his official capacity
      as Secretary of the U.S. Department of the
      Navy;

27.   U.S. DEPARTMENT OF THE NAVY; and

28.   THE UNITED STATES OF AMERICA,

                              *Defendants*.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On September 9 of this year, the President of the United States unilaterally

issued a mandate compelling federal employees to either receive a COVID-19 vaccine or

lose their jobs (the "vaccine mandate").

2.      This mandate requires that all federal employees, including persons working

remotely, get vaccinated against COVID-19.  *See* Exec. Order No. 14043, *Requiring

Coronavirus Disease 2019 Vaccination for Federal Employees*, 86 Fed. Reg. 50989 (Sept.

9, 2021) ("EO 14043").  *See* Exhibit 1.  Nor does it account for the natural immunity of

any federal employee subject to this mandate.  *See id*.

3.      The sheer size of the federal workforce drives home the enormity of this

vaccine mandate.  The federal government is estimated to have more than 9 million

employees, which is around 6 percent of total U.S. employment.  *See* Kristin Tate, *The

sheer size of our government workforce is an alarming problem*, The Hill, Apr. 14, 2019,

3

https://thehill.com/opinion/finance/438242-the-federal-government-is-the-largest-employer-in-the-nation.

4.    The President unilaterally has issued this *diktat* without any semblance of a congressional authorization.  Congress has enacted no law so permitting the President.  In fact, EO 14043's invocation of 5 U.S.C. §§ 3301, 3302, and 7301 fall flat.  None of those statutory provisions even remotely empower the President to issue a vaccine mandate or, really, a mandate of any kind.  That would be a hard sell any way because, under the Major Questions Doctrine, a matter of such vast political and economic significance as this vaccine mandate requires *explicit* congressional authorization.  Congress has provided no such express authorization.  For these reasons, this mandate also runs afoul of the Administrative Procedure Act ("APA") both because it is not in accordance with law and is in excess of the Executive's statutory authority and because it is arbitrary and capricious.

5.    Our Constitution's structural provisions do not countenance this vaccine mandate either.  The Tenth Amendment and the other federalism provisions of the Constitution do not come to Defendants' aid.  The federal government, it is clear, is without power to invade the police powers of the States concerning health, safety, and morals.  In addition, the separation of powers and the non-delegation principle preclude this vaccine mandate both because it cannot be the product of a statute guided by an intelligible principle and, more broadly, because this vaccine mandate amounts to lawmaking, which rests within the exclusive preserve of Congress.

6.    All this is in keeping with how our "compound republic"—constitutionally enshrining a separation of powers among the three branches of the federal government and

a further federalist allocation of federal and state power—was meant to operate. THE FEDERALIST No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961). This mandate is also repugnant to the Executive's constitutional obligation to "take care that the laws be faithfully executed." U.S. CONST. art. II, § 3 (capitalizations altered).

7.     What is more, the vaccine mandate violates the religious liberty protected by the Free Exercise Clause of the First Amendment and a super-statute such as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*. It violates the due process right to bodily integrity enjoyed by individual Oklahomans subject to this mandate. This mandate, moreover, contravenes the Fourth Amendment right against unconstitutional searches and seizures also enjoyed by those Oklahomans. This vaccine mandate sets an unconstitutional condition—getting the COVID-19 vaccination against their will—for federal employees to keep their jobs. It's a Hobson's choice. The mandate's manifest goal is to force as many people to take the vaccination as is possible.

8.     This vaccine mandate certainly interferes with the sovereign prerogatives of the State of Oklahoma. It undermines the laws, public policy, dignity, and interests of the State of Oklahoma in governing the field of public health, including vaccinations.

9.     That said, the damage inflicted by this vaccine mandate goes further, runs deeper, and is even more imminent. The federal government is trying to disarm the State of Oklahoma from protecting itself, its territory, and its citizens. *See* Jennifer Steinhauer, *The U.S. Army secretary to National Guard members who resist the vaccines: Prepare for discipline*, N.Y. Times, Nov. 18, 2021, https://www.nytimes.com/2021/11/18/world/national-guard-army-vaccine.html ("The

secretary of the Army has issued a memo warning the hundreds of thousands of soldiers in its National Guard that if they decline to get vaccinated against the coronavirus, they may not be renewed in the guard."). On November 29 of this year, the Pentagon doubled down on this Executive fiat by commanding that all Oklahoma National Guard members *must* get vaccinated.[1]

10.     On November 30 of this year, the Secretary of Defense Lloyd J. Austin III issued a memorandum entitled *Coronavirus Disease 2019 Vaccination for Members of the National Guard and the Ready Reserve*. *See* Exhibit 2. This memorandum stated that without a vaccination (or a valid exemption), no one could "participate in drills, training and other duty conducted under [T]itle 32 … [of the] U.S. Code." *Id*.

11.     This memorandum further stated that "[n]o Department of Defense funding may be allocated for payment of duties performed under title 32 for members of the National Guard who do not comply with Department of Defense COVID-19 vaccination requirements." *Id*. (referring presumably to 32 U.S.C. § 108). The memorandum added:

---

[1] *See, e.g.*, Ellie Kaufman & Oren Liebermann, *Pentagon denies Oklahoma governor's request and insists National Guard members must be vaccinated*, CNN, Nov. 29, 2021, https://www.cnn.com/2021/11/29/politics/pentagon-oklahoma-vaccine/index.html; Lolita C. Baldor & Robert Burns, *Oklahoma bid for Guard exception to vaccine mandate denied*, ABC News, Nov. 29, 2021, https://abcnews.go.com/Health/wireStory/austin-denies-oklahoma-bid-exception-vaccine-mandate-81452238; Eleanor Watson, *Defense secretary denies request to exempt Oklahoma National Guard from vaccine requirement*, CBS News, Nov. 30, 2021, https://www.cbsnews.com/news/covid-vaccine-mandate-oklahoma-national-guard-denied-exemption/; Alex Horton, *Pentagon chief denies Oklahoma governor's bid to exempt Guard troops from vaccine mandate*, Wash. Post, Nov. 30, 2021, https://www.washingtonpost.com/national-security/2021/11/30/oklahoma-national-guard-vaccine-mandate/.

"No credit or excused absence shall be afforded to members who do not participate in drills, training, or other duty due to failure to be fully vaccinated against COVID-19." *Id*.

12.    This mandate ensures that many Oklahoma National Guard members will simply quit instead of getting the vaccine, a situation that will irreparably harm Oklahomans' safety and security. *See id*. ("In Oklahoma, 89 percent of airmen in the Guard have been vaccinated, while only 40 percent of Army guardsmen have had shots."). The same is doubtless true in many States.

13.    In fact, individual Plaintiffs are particularly at risk under this vaccine mandate. They are Oklahoma Air National Guard members whom the Biden Administration is adamant on punishing if they do not get the vaccine. And one of them is even retiring after 20 years of service solely because she does not want to get the vaccine. Individual Plaintiffs are patriots who always have given of themselves to their Country and their State; and are now at risk of being turned out of their jobs because they do not wish to take the vaccine.

14.    As deleterious as all this is, the Biden Administration's work in this space extends deeper. No longer able or willing to mask his disdain for unvaccinated Americans, the President admitted the same day that he issued EO 14043 that his "patience [with them] is wearing thin."[2]    He has also commanded federal contractors' employees to get vaccinated, *see* Exec. Order No. 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*, 86 Fed. Reg. 50985 (Sept. 9, 2021) ("EO 14042"), and on November

---

[2] President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021) (transcript available at https://tinyurl.com/3ky6c3rt).

4, 2021, his Department of Labor ("Labor Department") declared that around 84 million private employees working at businesses with 100 or more employees will be forced to get vaccinated by January 4, 2022.[3]   This interim final rule makes clear that the President might extend it to cover smaller businesses as well.  All of this is without statutory warrant and even a word of authorization from Congress.

15.     The vaccine mandate on federal employees is unlawful, unconstitutional, and tyrannical.  This does not reflect the Land of the Free.  The mandate's enforcement should permanently be enjoined.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331 and 1361.

17.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

18.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because: (1) Plaintiffs reside in Oklahoma and no real property is involved, and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

---

[3] Interim final rule: COVID-19 Vaccination and Testing; Emergency Temporary Standard, U.S. Dep't of Labor: Occupational Safety and Health Administration, Docket No. OSHA-2021-0007, RIN 1218-AD42, 29 CFR Parts 1910, 1915, 1917, 1918, 1926, and 1928, https://public-inspection.federalregister.gov/2021-23643.pdf; Spencer Kimball & Leslie Josephs, *Businesses have until after the holidays to implement Biden Covid vaccine mandate*, CNBC (Nov. 4, 2021), https://www.cnbc.com/2021/11/04/biden-vaccine-mandate-businesses-have-until-after-christmas-to-comply.html.

19.    Venue also lies in this district under 28 U.S.C. § 1391(e)(1) because the State of Oklahoma is a resident of every judicial district in its sovereign territory.  That, of course, includes the Western District of Oklahoma (as well as the Oklahoma City Division).

## PARTIES

20.    Plaintiff State of Oklahoma is a sovereign state of the United States of America.

21.    Plaintiff J. Kevin Stitt is the Governor of the State of Oklahoma.  He is the State's chief executive.

22.    Plaintiff John M. O'Connor is the Attorney General of the State of Oklahoma.  He is the State's chief legal officer and has the authority to represent the State in federal court.

23.    Now come the *individual Plaintiffs* who are seeking this Court's intervention to stop this vaccine mandate from depriving them of a job they love so much in the service of a Country that means more than life itself to them.

24.    Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 1 is a member of the Oklahoma Air National Guard.  She does not want to take the COVID-19 vaccination and is retiring soon for that reason.  Otherwise, she would be forced out of the Oklahoma Air National Guard.

25.    Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 2 is a member of the Oklahoma Air National Guard.  She does not want to take the COVID-19

vaccination.  This vaccine mandate insists she must do so if she wants to keep her job.  She has a religious as well as a secular objection to taking the COVID-19 vaccination.

26.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 3 is a member of the Oklahoma Air National Guard.  She does not want to take the COVID-19 vaccination.  This mandate insists that she must do so if she wants to remain a member of the Oklahoma Air National Guard.

27.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 4 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.  He has a religious as well as a secular objection to taking the COVID-19 vaccination.

28.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 5 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate requires that he do so if he wants to remain a member of the Oklahoma Air National Guard.

29.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 6 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.  He has a religious as well as a secular objection to taking the COVID-19 vaccination.

30.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 7 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19

vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.  He has a religious as well as a secular objection to taking the COVID-19 vaccination.

31.   Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 8 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.  He has a religious as well as a secular objection to taking the COVID-19 vaccination.

32.   Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 9 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

33.   Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 10 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

34.   Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 11 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

35.   Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 12 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19

vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

36.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 13 is a member of the Oklahoma Air National Guard as well as a General Schedule employee of the U.S. Department of Defense.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

37.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 14 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

38.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 15 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

39.     Plaintiff OKLAHOMA AIR NATIONAL GUARD MEMBER 16 is a member of the Oklahoma Air National Guard.  He does not want to take the COVID-19 vaccination.  This mandate insists that he must do so if he wants to remain a member of the Oklahoma Air National Guard.

40.     Defendant Joseph R. Biden, Jr. is the President of the United States.  He issued EO 14043 in early September of this year.

41.     Defendant Safer Federal Workforce Task Force (the "SFWTF") was established pursuant to President Biden's Exec. Order No. 13991, Protecting the Federal Workforce and Requiring Mask-Wearing, 86 Federal Register 7045 (Jan. 20, 2021).  The three co-chairs who oversee the SFWTF are: (1) the Director of the Office of Personnel Management ("OPM"); (2) the Administrator of the General Services Administration ("GSA"); and (3) the COVID-19 Response Coordinator.

42.     Defendant Federal Acquisition Regulatory Council ("FAR Council") is the agency exclusively charged with creating "[g]overnment-wide procurement regulation[s]." 41 U.S.C. § 1303(a)(1).

43.     Defendant Office of Personnel Management ("OPM") is an agency of the United States Government.

44.     Defendant Office of Management and Budget ("OMB") is an agency of the United States Government.

45.     Defendant General Services Administration ("GSA") is an agency of the United States Government.  Defendant Office of Personnel Management Director, Kiran Ahuja ("Director Ahuja"), is a co-chair and member of the SFWTF and represents the federal agency responsible for managing human resources for civil service of the federal government.

46.     Defendant Office of Management and Budget Acting Director, Shalanda D. Young (the "OMB Director"), is a member of the SFWTF and represents the federal agency with delegated authority, by President Biden, to publish determinations relevant to EO 14043 and the SFWTF Guidance to the Federal Register.

47.     Defendants Mathew C. Blum, Lesley A. Field, John M. Tenaglia, Jeffrey A. Koses, and Karla S. Jackson are members of the FAR Council on account of their roles in their respective agencies.  They are sued in their official capacities.  Defendant Blum is the Chair of the FAR Council.  Defendant Field is the Acting Administrator for Federal Procurement of OMB.

48.     Defendant Robin Carnahan, Administrator of General Services (the "GSA Administrator"), is a co-chair and member of the SFWTF and represents the federal agency responsible for managing and supporting the basic functioning of federal agencies.

49.     Defendant Jeffrey Zients, COVID-19 Response Coordinator (the "COVID-19 Response Coordinator"), is a co-chair and member of the SFWTF.

50.     Defendant L. Eric Patterson, Director of the Federal Protective Service (the "FPS Director"), is a member of the SFWTF.

51.     Defendant James M. Murray, Director of the United States Secret Service (the "Secret Service Director"), is a member of the SFWTF.

52.     Defendant Deanne Criswell, Director of the Federal Emergency Management Agency (the "FEMA Director") is a member of the SFWTF.

53.     Defendant Rochelle Walensky, Director of the Centers for Disease Control and Prevention (the "CDC Director"), is a member of the SFWTF.

54.     Defendant Austin is the Secretary of the U.S. Department of Defense (the "Secretary of Defense").

55.     Defendant U.S. Department of Defense ("Pentagon" or "DoD") is an agency of the United States Government.

14

56.     Defendant Frank Kendall is the Secretary of the U.S. Department of the Air Force (the "Air Force Secretary").

57.     Defendant U.S. Department of the Air Force ("USAF") is an agency of the United States Government.

58.     Defendant Christine Wormuth is the Secretary of the U.S. Department of the Army (the "Army Secretary").

59.     Defendant U.S. Department of the Army ("US Army") is an agency of the United States Government.

60.     Defendant Carlos Del Toro is the Secretary of the U.S. Department of the Navy (the "Navy Secretary").

61.     Defendant U.S. Department of the Navy ("US Navy") is an agency of the United States Government.

62.     Defendant United States of America includes the departments and agencies thereof.

63.     All these Defendants have acted under the color of federal law with their authority purportedly derived from the Defendant United States of America.

## FACTUAL ALLEGATIONS

64.     On January 20, 2021—his first day in office—President Biden signed Executive Order ("EO") 13991, *Protecting the Federal Workforce and Requiring Mask-Wearing*, 86 Federal Register 7045 (86 Fed. Reg. 7045) creating the SFWTF.  *See* Exhibit 3.

65.    The President charged the SFWTF with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic."  86 Fed. Reg. at 7046.

66.    The SFWTF is led by the White House COVID-19 Response Team, the GSA, and the OPM.  It includes: the CDC, the OMB, FEMA, the Department of Veterans Affairs ("VA"), the Federal Protective Service ("FPS"), and the United States Secret Service ("USSS").

67.    Three co-chairs lead the SFWTF: (1) the Director of the OPM; (2) the Administrator of GSA; and (3) the COVID-19 Response Coordinator.  EO 13991 also required the GSA to "provide funding and administrative support for the" SFWTF.  *Id*.

68.    At that time, the federal government's position was that it lacked any authority to impose vaccines on federal employees.  That is why, during a July 23, 2021 press briefing, White House Press Secretary Jen Psaki admitted that the federal government's role is not to impose vaccine mandates.

69.    Psaki added: "What our role is and what we are going to continue to do is make the vaccine available. We're going to continue to work in partnership to fight misinformation.  And we're going to continue to advocate and work in partnership with local officials and—and trusted voices to get the word out."[4]  Instead, Psaki took care to

---

[4] Jen Psaki, White House Press Sec'y, Press Briefing in the White House Press Briefing Room (July 23, 2021), https://tinyurl.com/52ru4fut.

note, it was the function of "institutions, private-sector entities, and others" to impose appropriate vaccine mandates.[5]

70.     Likewise, then-President-Elect Biden said, on December 4, 2020, that "[n]o, I don't think [a COVID-19 vaccine] should be mandatory.  I wouldn't demand it to be mandatory."[6]  In short, the prominent faces of the incoming Executive Branch decisively shot down every suggestion of a vaccine mandate.

71.     Then, something surprising, really a complete *volte-face*, happened.  On September 9, 2021, President Biden issued EO 14043.  This EO declared that "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law."  *Id*.

72.     EO 14043 further instructs each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law."  *Id*.

73.     This EO also instructed the SFWTF to "issue guidance within 7 days of the date of this order on agency implementation of this requirement for all agencies covered by this order."  *Id*.

74.     That same day, the President issued EO 14042, requiring federal *contractors* to ensure that all their employees are vaccinated against COVID-19.  *See* Exhibit 4.  The EO failed to expressly provide for religious or medical exemptions to these protocols.

---

[5] *Id*.

[6] Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?,* NEWSWEEK (Sept. 10, 2021), https://tinyurl.com/37z7p8y5.

75.     Pursuant to EO 14043, the federal government has declared that in order to be deemed to be fully vaccinated, federal employees must "receive[] the requisite number of doses of a COVID-19 vaccine approved or authorized for emergency use by the U.S. Food and Drug Administration [(FDA)] or that has been listed for emergency use by the World Health Organization." Vaccinations, Safer Federal Work Force, https://www.saferfederalworkforce.gov/faq/vaccinations/.

76.     But that is not all.  Only after two weeks pass by after the employee has taken the dose(s) will she legally qualify as a person of fully-vaccinated status.  *See id*.

77.     The SFWTF further explains that the single dose *vis-à-vis* double dose regimen depends on which shot the employee gets.  *See id*.  "For Pfizer-BioNTech, Moderna, or AstraZeneca/Oxford, that is 2 weeks after an employee has received the second dose in a 2-dose series.  For Johnson and Johnson (J&J)/Janssen," the federal government's vaccine guidance says, "that is 2 weeks after an employee has received a single dose." *Id*.

78.     The SFWTF additionally explains that should the federal employee receive the **Pfizer-BioNTech COVID-19 vaccine**, then that employee "should get their second shot 3 weeks (or 21 days) after the first." *Id*.

79.     In order for a federal employee "to meet the vaccination deadline, [she] should receive their first vaccination no later than October 18." *Id*.

80.     A federal employee "would not be eligible for the second dose until November 8, which is the deadline by which they need to have received both shots." *Id*.

81.     Now come the SFWTF's instructions for the **Moderna COVID-19 vaccine**.

82.    A federal employee receiving that vaccine "should get their second shot 4 weeks (or 28 days) after their first." *Id*.

83.    In order to meet their vaccination deadline, a federal employee needed to have "receive[d] [her] first vaccination *no later than* October 11." *Id*. (emphasis added).

84.    A Moderna-recipient federal employee, SFWTF warns, "would not be eligible for the second dose until November 8, which is the deadline by which they need to have received both shots." *Id*.

85.    Countless federal employees, including all of the individual Plaintiffs, are subject to this vaccine mandate.  They are injured by this mandate.  Individual Plaintiffs are involved in protecting the national security of the United States and the security of the State of Oklahoma.

86.    This vaccine mandate does not exempt federal employees who are working remotely or otherwise not reporting to any work location.

87.    This mandate does not exempt employees even if they have natural immunity from COVID-19.  In fact, the kinds of exemptions afforded under this mandate are limited. To illustrate, the mandate states that "an agency may be required to provide a reasonable accommodation to employees who communicate to the agency that they are not vaccinated against COVID-19 because of a disability or because of a sincerely held religious belief, practice, or observance." *Id*.

88.    This vaccine mandate contravenes Oklahoma's law and public policy, not to mention the United States Constitution and federal laws.  It also harms the security of the State of Oklahoma and its residents as well as the security of our Nation itself.

89.     To put a fine point on it, the State of Oklahoma's sovereign dignity as well as its constitutional and legal powers and authority under the Federal and State Constitutions are acutely injured by this mandate.

90.     Furthermore and as suggested earlier, this mandate will force many Oklahoma residents in federal employ to resign or retire, depriving the State of Oklahoma of the law enforcement support it needs to protect itself and its citizens.  It is doubtful whether Oklahoma or any State would ever be able to fully recover from this damage and, in any event, the costs of doing so would be staggering and unprecedented.

91.     Such law-enforcement and military departures would also deprive Oklahoma of significant tax revenue and inflict attendant costs on the State because *any* federal employee who chooses not to get vaccinated will lose her federal employment and almost certainly cost the State tax dollars.

92.     These effects, individually and collectively, injure the State's interests as well as those of the individual Plaintiffs.


## CLAIMS FOR RELIEF

### COUNT I
### Vaccine Mandate Exceeds the Authority Congress Has Conferred on the President
### (Under 5 U.S.C. § 3301)

93.     The allegations in the preceding paragraphs are reincorporated herein.

94.     EO 14043 claims the authority to impose the vaccine mandate under, among other statutory provisions, 5 U.S.C. § 3301.

95.     In relevant part, Section 3301 permits the President to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the *efficiency* of that service" and to "*ascertain* the fitness of applicants as to age, *health*, character, knowledge, and *ability* for the employment sought." *Id*. (1)–(2) (emphases added).  Only the italicized concepts are relevant for our statutory interpretation.

96.     As a starting point, courts examine the ordinary, contemporary meaning of the statute as well as the meaning of the specific words in light of the overall statutory context.  *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014).  The core of this enterprise is to ascertain what the statute meant to the living community at the time of its enactment, which is to say what its words "conveyed to reasonable people *at the time they were written*." A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) (emphasis added).

97.     As is widely understood, the "prime directive in statutory interpretation is to apply the meaning that a *reasonable* reader would derive from the text of the law," so that "for hard cases as well as easy ones, the *ordinary* meaning (or the 'everyday meaning' or the 'commonsense' reading) of the relevant statutory text is the anchor for statutory interpretation." W. Eskridge, Interpreting Law 33, 34–35 (2016) (cleaned up and emphases added).  The enterprise of statutory interpretation asks "how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context."  Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2392–2393 (2003). "This approach" correctly "recognizes that the literal or dictionary definitions of [certain] words," when taken out of context, "will often fail to account for settled nuances or

21

background conventions that qualify the literal meaning of language and, in particular, of legal language." *Id.* Divorcing the meaning of the words from the context of the statute containing them makes for a "[bad] textualist." ANTONIN SCALIA, A MATTER OF INTERPRETATION 24 (1997); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) ("eschew[ing] uncritical literalism [that could] lead[] to results that no sensible person could have intended.") (cleaned up); A. Scalia & B. Garner, *supra*, at 167–239 (applying *contextual* canons to the endeavor of statutory interpretation); Caleb Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347, 376 (2005).

98.    Now we apply these principles to the Section 3301. First, nothing about "efficiency" in any part of the federal bureaucracy enables the President to issue a vaccine mandate. The ordinary, contemporary meaning of this provisions makes short work of any contrary position. At the time of Section 3301's enactment in 1966, "efficiency" in the federal workforce referred to productivity and output. To be precise, one prominent contemporary dictionary defined "efficiency" as "the ability to do something or produce something without wasting materials, time, or energy." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/efficiency. Another did virtually the same by thus defining "efficiency:" "The ratio of the effective or useful output to the total input in any system." The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=efficiency. "Efficiency," be it taken on its own terms or put into the context of Section 3301, does not concern matters such as public-health mandates or other subjects of comparable magnitude.

22

99.    Nor does anything in the legislative history of this provision call this inference into question.

100.    Therefore, the first clause of Section 3301 does not authorize this vaccine mandate.

101.    Next, the President's power to "ascertain the fitness of applicants as to … health … and ability for the employment sought" is similarly unavailing.  The ordinary, contemporary meaning of this provision confirms this view.  "Ascertain" concerns "find[ing]" something "out or learn[ing]" it "with certainty," not to doing anything about it. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ascertain. Similarly, another dictionary contemporaneously defined "ascertain" as "To discover with certainty, as through examination or experimentation."  The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=ascertain. The discovery *is* the end; examination and experimentation merely are the means to achieving that end.

102.    That sentence structure informs the application of the rest of the clause. "Health" means what it always has meant: the well-being of the human person.  And "ability" contemporaneously was defined as the "physical, mental, or legal power to do something" or the "competence in doing something."  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ability.  Similarly, "ability" also referred to: "The quality of being able to do something, especially the physical, mental, financial, or legal power to accomplish something" or "[a] skill, talent, or capacity."  The American

23

Heritage          Dictionary          of          the          English          Language,

https://www.ahdictionary.com/word/search.html?q=ability.

103.    The "ordinary" English meanings each of these terms suffices, *see Comcast*

*Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020),

because there is nothing "technical" about them, A. Scalia & B. Garner, *supra*, at 73; nor

does the statute provide a special definition that should supplant the ordinary meaning, *see*

*Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).

104.    The plain text of the second clause of Section 3302 indicates that this

provision authorizes the President *only* to find out the health, ability, etc., of the applicant

to serve in the pertinent role, not to impose conditions for such service.  To elaborate further,

the President's ascertaining of the civil service applicant's "health" does not entitle the

Executive to deem, *ex ante*, that said applicant is inexorably unwell and unfit to perform her

duties—and thus to force her to get vaccinated.  To the contrary, ascertainment of the health

refers only to the President's authority to find out the applicant's health-based suitability to

serve in the employment sought.  Similarly, the President's power to "ascertain the fitness

of [an] applicant[] as to … [her] ability for the employment sought" says nothing about the

measures the President can take after he ascertains that the applicant is unable to serve in

"the employment" she has "sought."

105.    In any case, here the President is not endeavoring to ascertain any federal

employee's health or ability for any purpose, much less for the employment she seeks.  He

is just jumping the gun and ordering every federal employee—regardless whether they are

naturally or otherwise immunized from Coronavirus, unlikely to get or transmit Coronavirus, or otherwise unwilling to get the vaccine—to get vaccinated.

106.   Beyond the plain meaning of these statutory provisions is the Major Questions Doctrine, which also declines to credit any claim of congressional authorization under Section 3301.

107.   Under this doctrine, the Supreme Court repeatedly, including just this Fall, has insisted that courts should refrain from assuming that Congress *implicitly* has delegated questions of "'deep economic and political significance'" to the Executive Branch. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In essence, a clear statement from Congress is required before the courts will make that inference. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). This is a corollary of the familiar interpretive principle that courts should not read "a specific concept into general words when [it is clear] that Congress knew how to identify that concept." W. Eskridge, Interpreting Law 415 (2016); *see also Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 297–98 (2006).

108.   Just over two years ago, Justice Kavanaugh thus summarized the Major Questions Doctrine: "In order for [the] [E]xecutive … to exercise regulatory authority over a major policy question of great economic and political importance [that the Constitution does not preemptively assign to the Executive], Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the

authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019) (statement respecting denial of certiorari).

109.    There is an additional aspect to it.    Executive claims about implicit congressional authorizations on matters of enormous economic and political importance are *particularly* infirm when they allege that Congress has permitted the Executive: (1) to "intrude[] into an area that is the particular domain of state law"—a space like public health, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; A. Scalia & B. Garner, *supra*, at 290–94—(2) to "alter[] the fundamental details of a regulatory scheme," *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001); (3) to significantly affect the security of or make enormous changes to the way the federal civil services lives and works and the preconditions of joining and staying in the civil service, *see generally Brown & Williamson Tobacco Corp.*, 529 U.S. at 160; or (4) to issue regulations in a space that the Constitution expressly and most carefully commits to Congress, *e.g.*, the power "to make rules for the government and regulation of the land and naval forces," U.S. Const. Art. I, § 8, cl. 14 (capitalizations altered).

110.    In order to deem this mandate to be a Section 3301 delegation, this Court would have to reject each of those presumptions.

111.    First, the Executive's position amounts to a claim that Congress has upset the federal-state balance by permitting federal policy on vaccinations concerning Oklahoma residents to override the law and public policy of Oklahoma as well as to jeopardize the public safety of Oklahomans by forcing the mandate on the National Guard units in Oklahoma, whose members are more likely to quit because of this mandate.

112.   Next, Congress is alleged to have clandestinely changed the legal and regulatory scheme concerning public-health mandates through the nebulous words of Section 3301.  That flies in the face of the presumption that Congress must speak clearly in such situations.

113.   Moreover, Congress is purported to have tacitly reordered the way that its civil service works and the prerequisites for being part of it.  That requires a clear statement from Congress; and Defendants surely cannot point to one.

114.   Finally, Congress is supposed to have surrendered to the Executive, through an amorphous statute, the core of its power to govern the way that the military operates. To say the least, that is a difficult claim to comprehend, let alone accept.

115.   As to the last point, Congress' carefully reticulated allocation of constitutional power concerning the military—giving Commander in Chief status and attendant responsibilities to the President, *see* Art. II, § 2, *but* giving the power to make rules concerning the military, *see* Art. I, § 8, cl. 14; the power to confirm senior military officers who are Officers of the United States, *see* Art. II, § 2; the power to declare war, *see* Art. I, § 8, cl. 11; and the power to fund the military, *see* Art. I, § 9, cl. 7, to one or both Houses of Congress—cautions against inferring through implication that Congress furtively gave away its power to make rules concerning federal employees who are military members.  The line between congressional and Presidential authority in this sphere admittedly can be blurry.  But what admits of no dispute is that imposing a vaccine mandate is a rule of the greatest consequence, one that falls squarely within Congress' power as opposed to the Executive's (if it be within federal control at all).  *See*, *e.g.*, *The Prize Cases*,

67 U.S. 635, 668 (1863) (Should "a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . [and] accept the challenge without waiting for any special legislative authority."). The suggestion that Congress silently or furtively handed this core authority over to the Executive is not only hard to fathom, it is implausible.

116. Basically, then, this vaccine mandate purports to "derive[] its authority from an old statute employed in a novel manner, imposes ... [m]illion[s] [of dollars] in compliance costs, involves broad medical considerations that lie outside of [the SFWTF's] core competencies, and purports to definitively resolve one of today's most hotly debated political issues." *BST Holdings, LLC v. OSHA*, 2021 WL 5279381, *8 (5th Cir. 2021).

117. Defendants' contention, therefore, boils down to this facile proposition: For the many decades that Section 3301 has been on the books, everyone just happened to miss the fact that it apparently entitled the Executive to issue health mandates of the most invasive sort on federal employees. It so happened that only when it suited Defendants' policy goals did they miraculously discover Section 3301's salutary potential and effectiveness. Perhaps such Orwellian or Kafkaesque mutations of the extant law work when we have fallen through the looking glass, but they do not work in the federal courts.

118. For the reasons stated, Section 3301 lacks any language affording the President the power to impose anything akin to a vaccine mandate on federal employees (or anyone else).

119. Nothing in Section 3301 authorizes the President to issue the vaccine mandate. This mandate should be invalidated on that basis.

**COUNT II**
**Vaccine Mandate Exceeds the President's Statutory Authority Yet Again**
**(Under 5 U.S.C. § 3302)**

120.    The allegations in the preceding paragraphs are reincorporated herein.

121.    The Executive also claims the authority to issue EO 14043 under 5 U.S.C. § 3302.

122.    Section 3302, though, concerns only selection procedures for the competitive service for career civil servants in the federal government.  Not only does this provision address nothing other than a process for a meritocratic federal competitive service system, it is confined to the President's authority to direct how that meritocracy will operate. To be specific, Section 3302 is replete with reticulated minutiae about how the President may conduct the operation of the federal competitive service.  None of this contains even a remote whisper of Congress' delegating to the Executive the power to issue vaccine mandates on federal employees.  Comparing apples with oranges comes to mind.

123.    Anything else would impute to Congress an authoritative command it simply has never given.  It follows that Congress has not addressed anything akin to a vaccine mandate in Section 3302's plain text; and the President's claimed authority is without merit.

124.    Nor is there anything in the legislative history of Section 3302 to rebut this inference.

125.    For the reasons given in Count I's discussion concerning Section 3301, there is nothing to see here as far as the Major Questions Doctrine is concerned either.    This vaccine mandate effectuates a matter of vast economic and political significance and thus

explicit congressional authorization is necessary. That express statutory warrant is conspicuously missing.

126. What is more, this vaccine mandate interferes with the federal-state balance; casually interferes with an established legal regime concerning federal civil service as well as public-health mandates; fundamentally disrupts the way Americans live and work; and presupposes that Congress surrendered its constitutional power to make rules about the military. All of it, apparently, Congress did silently. Really? Could it be? More than a fanciful leap of faith would be required to justify that jump. No one seriously believes it, or could believe it, to be true. Far from being consistent with Section 3302's ordinary, contemporaneous meaning, this flight of fancy would shatter that meaning.

127. Nothing in Section 3302, it follows, confers on the Executive the authority to issue a vaccine mandate on federal employees. And this mandate accordingly should be invalidated.

### COUNT III
**Vaccine Mandate in Yet Another Way Exceeds Statutory Authorization
(Under 5 U.S.C. § 7301)**

128. The allegations in the preceding paragraphs are reincorporated herein.

129. EO 14043 further contends that Congress, by enacting 5 U.S.C. § 7301, has conferred on the Executive the authority to impose a vaccine mandate on federal employees.

130. Section 7301's plain text—"The President may prescribe regulations for the conduct of employees in the executive branch"—does not bear Defendants' reading of Executive authority in this space. That is because nothing about EO 14043 concerns the

"conduct" of federal employees. Instead, that Executive Order concerns a vaccination directive, which is a *status*. Conduct and status frequently, and in this context, are diametrically opposed to one another.

131.  As with the Count I discussion, here too the "ordinary speaker of English" is the correct interpretive standard to channel, *see Comcast Corp.*, 140 S. Ct. at 1015, because Section 7301 contains no technical or special definition of "conduct," *see Tanzin*, 141 S. Ct. at 490; A. Scalia & B. Garner, *supra*, at 73.

132.  Every ordinary speaker of the English language knows now, as she did in 1966 when Section 7301 was enacted, that "conduct" concerns behavior and activity—and is the opposite of "status." "Conduct" is centered on action, whereas "status" is centered on the state of being. That state of being might be attained after some action is undertaken or endured but "status" refers only to the position that one enjoys, occupies, or otherwise finds ascribed to themselves.

133.  "Conduct" contemporaneously was defined as "to plan and do (something, such as an activity)." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conduct. Another reputable dictionary defined "conduct," in relevant part, as "[t]he way a person acts." The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=conduct. Conversely, "status" contemporaneously was defined as "state or condition with respect to circumstances." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/status. Another dictionary had "status" down as "[p]osition relative to that of others; standing" and as "[t]he legal character or condition of a person or

thing."    The    American    Heritage    Dictionary    of    the    English    Language,
https://www.ahdictionary.com/word/search.html?q=status.

134.    Had Congress wanted to authorize Presidential control over the federal
workforce's "status," instead of over its "conduct," Congress would have had little
difficulty in making that substitution.    *See*, *e.g.*, *John Hancock Mut. Life Ins. Co. v. Harris
Trust & Sav. Bank*, 510 U.S. 86, 104–05 (1993); *In re Generation Resources Holding Co.,
LLC*, 964 F.3d 958, 968 (10th Cir. 2020).    But there are numerous reasons that a vigilant
or even a rational Congress would not want to thus empower a potentially trigger-happy
Executive.    Enabling Presidents to govern federal employees' status would have vastly
empowered Presidents to apply egregiously exclusionary criteria to employees that
Congress might have deemed unacceptable.    Mind you, Section 7301 was enacted in an era
that constitutional doctrine had not moved to protect federal employees against certain
kinds of discrimination.    *See*, *e.g.*, *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976).    The
89th Congress, it safely can be deduced, would not lightly have wanted to hand all its chips
over to the Executive to do as the latter wished to federal employees.

135.    Defendants are stuck with a pesky noun used in the statute—"conduct"—a
noun they do not like, a noun that does not give them what they want, a noun they wish
heartily they could time-travel and change.    So they might devise a backdoor strategy:
Asking this Court to *diminish* the status of "conduct," from an operative term into a mere
mood-setter, so they might achieve their policy aim.    Defendants might wish for courts to
permit them to tweak Section 7301 just a little so they can achieve that particular end-goal.

136.    The Court should be well-advised to decline such an invitation.  For even if "conduct" and "status" were not terms so different from each other, the task of bridging *any* delta would still be Congress'—and its alone.  Courts "usually presume" that "differences in language" convey "differences in *meaning*."  *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) (emphasis added).  "[I]t is not [the judicial] function"—in fact, it is *contrary* to that function—to "treat alike subjects that ... [Congress] ha[s] chosen to treat differently."  *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 101 (1991).

137.    The business of altering laws enacted by Congress belongs to that branch alone because courts do not sit as "super-legislature[s]."  *Ewing v. California*, 538 U.S. 11, 28 (2003) (plurality opinion).  And the First Branch limited Presidential involvement to prescribing regulations about federal workforce's "conduct."  As the Supreme Court, individual Justices, and lower-court judges have long observed, the wisdom of congressional enactments is up to Congress, not to the federal courts, to reexamine and, if it sees fit, to recalibrate.  *See*, *e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 193 (2015) ("Congress gets to make policy, not the courts."); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) ("[A policy decision] is for Congress to tell us, not for us to tell Congress."); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) ("It may well be that Congress will take a fresh look at this new [phenomenon], just as it so often has examined other [phenomena] in the past.  But it is not our job to apply laws that have not yet been written."); *Tiger Lily, LLC v. U.S. Dep't of Housing & Urban Dev.*, 5 F.4th 666,

675 (2021) (Thapar, J., concurring) ("It is not our job as judges to make legislative rules that favor one side or another."); *United States v. McCauley*, 983 F.3d 690, 696 (4th Cir. 2020) (Wilkinson, J.) ("[I]t is not our job to question the legislature's judgment").

138.   That concept is in keeping with the twin principle that the federal courts do not sit to assess the wisdom of positive laws—only their constitutionality.  *See*, *e.g.*, *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring) (quoting Justice Marshall to echo the latter's view that "'[t]he Constitution does not prohibit legislatures from enacting *stupid laws*.'") (emphasis added); Chief Justice John Marshall, A Friend of the Constitution No. V, Alexandria Gazette, July 5, 1819, in John Marshall's Defense of *McCulloch v. Maryland* 190–191 (G. Gunther ed. 1969) ("The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional.").

139.   As things currently stand, it is only federal employees' "conduct" regarding which Section 7301 permits the President to prescribe regulations.  And mandatory vaccinations are the opposite of "conduct."  They concern individuals' health-related *status*, *i.e.*, whether or not a federal employee is vaccinated against COVID-19.

140.   Nor does the legislative history of Section 7301 call this inference into question.

141.   Additional support for this position comes from the "backdrop against which Congress" in 1966 enacted Section 7301.  *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487 (2005); *see also* A. Scalia & B. Garner, *supra*, at 324 ("When [a statutory] term" or concept "has been authoritatively interpreted" or emphasized "by a high court," then courts should

"reasonably enough assume that, in statutes pertaining to that field, the term" or concept "bears this same meaning."). Just a few years earlier, the Supreme Court had struck down a state law violating the Eighth Amendment because it criminalized the status of being a drug addict, not the conduct of taking narcotics. *Robinson v. California*, 370 U.S. 660 (1962). The California law in question, as the Court read it, was "not one which punishes a person for the *use* of narcotics, for their *purchase*, *sale* or *possession*, or for *antisocial or disorderly behavior* resulting from their administration" or one "which even purports to provide or require medical treatment." *Id*. at 666 (emphasized to show the Court's focus on conduct). Instead, this state statute "ma[de] the '*status*' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.'" *Id*. (emphasis added). The Court's opinion was accompanied by a concurrence and two powerful dissents. *See id.* at 668 (Douglas, J., concurring); 679 (Clark, J., dissenting); 685 (White, J., dissenting). The importance of the subject matter and the status-not-conduct doctrine under which *Robinson* was decided mean that this status/conduct distinction could hardly have escaped Congress' notice 4 years later when it enacted Section 7301. In fact, this clearly "is the background against which Congress" must be presumed to have "legislated in enacting" Section 7301. *See Univ. of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 347 (2013).

142. Executive Branch practice also supports Plaintiffs' understanding that "conduct" exclusively means behavior and actions. Historically, under Section 7301, Presidents have issued executive orders concerning *conduct* such as: smoking on federal property, *see* Exec. Order No. 13058, *Protecting Federal Employees and the Public from*

*Exposure to Tobacco Smoke in the Federal Workplace*, Aug. 9, 1997, 62 Fed. Reg. 43451 ("EO 13058"); the taking of drugs by federal employees, *see* Exec. Order No. 12564, *Drug-Free Federal Workplace*, Sept. 15, 1986, 51 Fed. Reg. 32889 ("EO 12564"); the solicitations and acceptances of gifts or other items of value by federal employees under certain circumstances, *see* Exec. Order No. 12674, *Principles of Ethical Conduct for Government Officers and Employees*, Apr. 12, 1989, 54 Fed. Reg. 15159, *as amended by* Exec. Order No. 12731, Oct. 17, 1990 ("EO 12674"); federal employees' participation in community-service activities, *see* Exec. Order No. 13401, *Responsibilities of Federal Departments and Agencies with Respect to Volunteer Community Service*, Apr. 27, 2006, 71 Fed. Reg. 25737 ("EO 13401"); and domestic violence, *see* Presidential Memorandum: *Establishing Policies for Addressing Domestic Violence in the Federal Workplace*, Apr. 18, 2012, 77 Fed. Reg. 24339.  Of course, none of these subject matters pertains to status— only to conduct.  EO 14043 sticks out as the awkward odd man out.

143.    As with Counts I and Counts II, here too the Major Question Doctrine makes short work of the vaccine mandate.  This mandate is of enormous economic and political significance, which means Congress needed to have spoken clearly permitting the President to impose such a mandate on the federal workplace.  Congress has done no such thing.  On top of that, this vaccine mandate destabilizes the federal-state balance; upends the way that federal civil service, not to mention public-health mandates, work under the law; turns upside-down Americans' lives and work paradigms; and pretends that Congress surrendered its constitutional power to make rules about the military.  It simply is not plausible to maintain any, let alone *all*, of those things.  They fail the straight-face test.

144.     Accordingly, 5 U.S.C. § 7301 does not authorize this vaccine mandate, which should be invalidated.

## COUNT IV
**Agency Action Not in Accordance with Law and in Excess of Authority and Arbitrary and Capricious Agency Action in Violation of the APA (Asserted Under the APA, 5 U.S.C. § 706)**

145.     The allegations in the preceding paragraphs are reincorporated herein.

146.     Another statutory claim concerns the APA, which of course "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

147.     Under the APA, a court should "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).   This is the first respect in which this vaccine mandate violates the APA.

148.     As addressed in Counts I—III, Defendants' vaccine mandate exceeds the authority Congress has conferred on the Executive, namely through 5 U.S.C. §§ 3301, 3302, and 7301.

149.     The Executive issued this mandate, it follows, without valid congressional authorization.   As Justice Breyer once perspicaciously noted, "judicial insistence upon … [Executive] consultation [with Congress] [would] not weaken our Nation's ability to deal with danger" or crises. *Hamdan v. Rumsfeld*, 548 U.S. 557, 636 (2006) (concurring opinion).

150.     Therefore, this vaccine mandate is not in accordance with law and exceeds

the authority Congress has afforded the Executive Branch. This mandate, accordingly, violates the APA. But that is not all.

151.    The mandate violates the APA in another way as well. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The question is whether the SFWTF acted "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc*., 462 U.S. 87, 105 (1983).

152.    Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate," *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015), and does not consider the natural immunity of the federal employees subjected to this mandate. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 42–43 (1983) ("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

153.    The Supreme Court repeatedly and firmly has stated that reviewing courts assessing the lawfulness of agency actions should consult "'the grounds that the agency invoked *when* it took the [challenged] action.'" *DHS v. Regents of the Univ. of Cal*., 140 S. Ct. 1891, 1907 (2020) (emphasis added) (quoting *Michigan*, 576 U.S. at 758); *id*. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

38

154.    It is clear that the agency did *not* "examine[] the relevant data" or "articulate[] a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (cleaned up).

155.    The injuries inflicted by this mandate on Oklahoma and her sister States or the other Plaintiffs are not mentioned, much less explained, in the mandate or the attendant administrative record.

156.    Defendants have also failed to explain their departure from prior practice, as the APA requires.  SFWTF essentially has walked away from the Executive Branch's prior policy "without any consideration whatsoever" of a less drastic or extreme measure than this blunderbuss vaccine mandate.  *State Farm*, 463 U.S. at 51.  Such an "unexplained inconsistency" is fatal.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  It did not work in *Regents*; it did not work in *State Farm*; and it should not work here either.

157.    Even if Defendants were to devise, albeit *post hoc*, some argument that they had a previously overlooked statutory duty to impose this vaccine mandate, that still would not get them over the finish line.  As the Supreme Court took care to point out in *Regents*, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program" carrying sweeping ramifications.  *Regents*, 140 S. Ct. at 1910.  This vaccine mandate is such a policy, if there ever was one.

39

158.    Moreover, Defendants have neither accounted for Oklahoma's sovereignty, laws, reliance interests, costs, and other pertinent factors nor considered the injuries this mandate inflicts on individual Plaintiffs nor, for that matter, contemplated lesser alternatives—each of which renders Defendants' policy arbitrary and capricious. *See id.* at 1913.

159.    Further related and non-exhaustive considerations lead inexorably to the conclusion that this mandate is unlawfully arbitrary and capricious:

   a. Defendants' failure to consider the mass exodus of unvaccinated federal employees in our current economy that is already facing a vast dearth of labor, inflation, and supply-chain challenges;

   b. Defendants' failure to consider the legal claims and factual assertions made in this Complaint as well as in the parallel lawsuits filed to challenge this vaccine mandate;

   c. Defendants' failure to exempt those who have a natural immunity to COVID-19; and

   d. Defendants' failure to exempt those who work remotely in a way that renders them unlikely to catch or spread COVID-19.

160.    "Reasoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action.  What was provided here was" at best "more of a distraction" and at worst conclusory. *Dep't of Commerce*, 139 S. Ct. at 2596.

161.    Critically, "[t]he reviewing court" may not "attempt itself to make up for such [agency] deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

162.    As a consequence, the vaccine mandate is arbitrary and capricious in violation of the APA.

## COUNT V
### Violation of Oklahoma's Constitutional Rights as a Sovereign State
### (Asserted Under Tenth Amendment to the U.S. Constitution and Because this Vaccine Mandate Exceeds the Federal Government's Constitutional Authority)

163.    The allegations in the preceding paragraphs are reincorporated herein.

164.    Now we come to the constitutional violations caused by this vaccine mandate.   We begin with federalism, which, felicitously enough, is among the oldest subjects of constitutional debate in our Nation's history.   *See New York v. United States*, 505 U.S. 144, 149 (1992).

165.    It is fundamental, indeed indispensable, to our constitutional structure that "our Constitution establishes a system of dual sovereignty between the States and the Federal Government."   *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).   "[A]llocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States … in part, [as] an end in itself, to ensure that States function as political entities in their own right."   *Bond v. United States*, 564 U.S. 211, 221 (2011) (*Bond I*).

166.    Although "[t]he Federal Government has expanded dramatically over the past two centuries, ... it still must show that a constitutional grant of power authorizes each" and every single one "of its actions."   *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 535 (2012) (citing *United States v. Comstock*, 560 U.S. 126 (2010)).   States do not operate under the same constraint.   *See id.*

167.    Furthermore, "[s]tate sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York*, 505 U.S. at 181 (cleaned up).  This is because "[b]y denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond I*, 564 U.S. at 222.

168.    The Supreme Court has "long recognized the role of the States as laboratories for devising," legislating, and, when they so choose, *changing* their "solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009).  As the Court recently noted, "[such] choice[s] [are] for [the State] to make—and, if it wishes, to remake and remake again as the future unfolds." *Kahler v. Kansas*, 140 S. Ct. 1021, 1037 (2020) (Kagan, J.).

169.    "[T]he States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear," so that citizen wellbeing may be optimized with the benefit of reason and empiricism alike.  *See United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

170.    In addition, meaningful deference to State-level policymaking "allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic

processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'" *Bond I*, 564 U.S. at 221.

171. Under core principles of federalism, the federal government is one of enumerated powers, *see Lopez*, 514 U.S. at 552; and it lacks the general police power to regulate health, safety, and morals.

172. Regulating health, safety, and morals of the populace is a power belonging to the States. *See Printz v. United States*, 521 U.S. 898, 919 (1997) ("Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that '[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'").

173. It is beyond cavil that "[t]he Constitution's enumeration of Congress's powers in Article I, Section Eight means that federal intervention in any subject is interstitial, specialized, and limited, while [the role of States] is general and universal." *See* Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 Tex. L. Rev. 781, 827 (2013).

174. As James Madison envisioned long ago, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." THE FEDERALIST No. 47,

at 298 (Clinton Rossiter ed., 2003); *see also McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819).

175.   This vaccine mandate wants to flip that allocation of power and hand total control over the federal workforce's very persons and bodies to just one person—the Executive.  Scarcely has a federal move been more draconian or antithetical to the Framers' vision of our federal system of government.

176.   All this was understood, and constitutionally recognized as intact rights, as the States entered the Union and united our Nation as one whole.  *E Pluribus Unum*.  But to assuage some nervous States without whose support the Constitution was not likely to be ratified, the Tenth Amendment was added to make explicit what already was well-known and easily understood: the unbroken sovereignty of the States (minus the powers explicitly conferred by the Constitution to the national government of limited and enumerated powers).  *See*, *e.g.*, 1 J. Elliot, Debates on the Federal Constitution 334 (1891); 4 *id*., at 244.

177.   Alexander Hamilton thought a bill of rights, including the Tenth Amendment, "unnecessary" and even "dangerous." THE FEDERALIST No. 84, at 559 (Modern Library ed. 1937).  Ever the pragmatist, Madison ultimately came around to the view that a bill of rights would "do no harm and might do a great deal of good," *Wallace v. Jaffree*, 472 U.S. 38, 93–94 (1985), in the interest of "prudence," 1 Annals of Cong. 431–32. Madison reasoned that a bill of rights would give "those who had been friendly to the adoption of this Constitution … the opportunity of proving to those who were opposed to it that they were as sincerely devoted to liberty and a Republican Government,

as those who charged them with wishing the adoption of this Constitution in order to lay the foundation of an aristocracy or despotism." *Id*.  George Mason consistently supported a bill of rights.

178.    Our Bill of Rights came into being.  The Tenth Amendment reinforced the sovereignty of the States that already was clear and even innate to the Framing generation's comprehension.   "Residual  state  sovereignty  was  ...  implicit  ...  in  the  Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment[]." *Printz*, 521 U.S. at 919.  In essence, the Tenth Amendment merely was a key mechanism added, from abundance of caution, to ensure that the rights of the States did not go dishonored by the federal government.

179.    Our States possess "a residuary and inviolable sovereignty."  THE FEDERALIST No. 45, at 289 (James Madison) (Clinton Rossiter ed., 2003).  "The powers reserved to the several States," it was understood by the living community at the time of the Founding, "will extend to all the objects which, in the ordinary course of affairs, concern  the  lives,  liberties,  and  properties  of  the  people,  and  the  internal  order, improvement, and prosperity of the State."  *Id*. at 45.

180.    "[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere."  THE FEDERALIST No. 39, at 245 (J. Madison).

181.    "The Constitution may," of course, "restrict state governments—as it does, for example, by forbidding them to deny any person the equal protection of the laws" or by prohibiting them from depriving anyone of their bodily integrity under due process. *Sebelius*, 567 U.S. at 535.  "But where such prohibitions do not apply, state governments do not need constitutional authorization to act." *Id*.

182.    This helps explain why "[t]he States can and do perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few—even though the Constitution's text does not authorize any government to do so." *Id*. at 535–36.  These are known as the States' "police power[s]." *Id*. at 536.

183.    Consequently, the "police power" is "inherent in the states" and certainly is "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935).  But the provenance of that power long predates the Founding or the existence of our Union.  In fact, that power of our States stems from an earlier source fundamentally *primordial* to a State's entering into the Union. Plainly speaking, "the Constitution is *not* the source of the[] [States'] power." *Sebelius*, 567 U.S. at 535 (emphasis added).

184.    A police power, encompassing public health, public safety, and public morals, is "a power which the state did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905) (Harlan, J.).

185.    The power to address matters of public health is a police power; and it belongs exclusively to the State.  *See*, *e.g.*, *Zucht v. King*, 260 U.S. 174, 176 (1922) ("it is within the *police power of a state* to provide for [or to decline to require] compulsory vaccination") (emphasis added).

186.    To that end, a State may "invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety." *Jacobson*, 197 U.S. at 25.  Since the State enjoys this power, the federal government may not invade this space.

187.    Indeed, the seminal case upholding compulsory vaccinations under some circumstances—*Jacobson*—was decided the way it was *on the explicit assumption* that vaccinations were an exercise of *State* police powers.  *Id*. at 25 ("According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.").  The federal government has little, if anything, to do here.

188.    A further comment on public safety as a component of the State's police powers is appropriate.  The Constitution "leaves intact the[] [States'] inherent power to protect their territory."  *Ariz. v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring in part and dissenting in part).  In fact, as Justice Scalia recognized, "the States have the right to protect their borders against foreign nationals" and other threats, which is also an intact primordial right with which the States entered the Union.  *Id*. at 424 (opinion concurring in part and dissenting in part).

189.    The States entered the Union with the understanding that they would not have to surrender this right.   That was the bargain, the deal, they struck with the national government.   The federal government does not get to wash its hands of terms inconvenient to it while demanding performance of the terms it likes.

190.    The Supreme Court historically has recognized this State prerogative.   *See*, *e.g.*, *Mayor of New York v. Miln*, 11 Pet. 102, 130–39 (1837) (recognizing States' intrinsic constitutional power to control their own security).   That is because our Nation is, after all, a "Union of sovereign States."   *Hinderlider v. La Plata River & Cherry Creek Ditch Co*., 304 U.S. 92, 104 (1938); *see also Ariz.*, 567 U.S. at 423 (Scalia, J., concurring in part and dissenting in part) (stating that we are "a Union of independent States, who have their own sovereign powers.").

191.    To an earlier point, "[b]ecause the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed."   *Sebelius*, 567 U.S. at 536.

192.    Protecting its own security undoubtedly is a sovereign power of the State— indeed, it is an indispensable pillar of sovereignty—one that is critical to Oklahoma's very existence.   *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more important than the security of the [people].");   1 Restatement (Third) of Foreign Relations Law of the United States § 206, Comment b, p. 94 (1986) (noting that sovereignty "implies a state's lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there").

48

193.    This federalism debate as to vaccinations and other public-health policies was settled in the State's favor.  Although *Jacobson* and *Miln* preceded the Court's later expansion of federal power, nothing in that jurisprudence negates the State's police powers to regulate, as it were, public health and public safety.

194.    The only remaining question—Does the President have the unilateral executive power granted in Article II of the Constitution to issue a vaccine mandate like the one at issue here?—was settled in the Steel Seizure Cases.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  If that power exists at all, it must come from the U.S. Constitution Article II, Section 1.

195.    *Youngstown* is outcome-determinative for our purposes.  The Supreme Court faced *Youngstown* in the middle of a martial conflict.  Without skipping a beat, the Supreme Court invalidated President Truman's unilateral effort to seize steel mills to scale up steel production to aid in the war effort.  343 U.S. 579.  The manifest perils and the deleterious, long-lasting consequences of war were not alien to the Court, which had just witnessed World War II with one of its own Members—Justice Jackson—serving as the Nuremberg prosecutor.  What the President had sought in *Youngstown* to do was lawmaking, and that was a power the Constitution commits to Congress, not to the Executive.  *See id*.

196.    The very fact that the Constitution commits lawmaking to Congress means that the Executive has no business making laws.  *See*, *e.g.*, *State ex rel. M'Cready v. Hunt*, 2 Hill (SC) 1, 171 (S.C. Ct. App. 1834) (Johnson, J.) ("If one having authority, prescribes the mode in which a particular act is to be done, can the agent who executes it substitute

any other?  Does not the act of prescribing the mode, necessarily imply a prohibition to all other modes?").

197.    The Framers had a capacious understanding of lawmaking, which perhaps was the reason that they set Congress forth as the First Branch before following up with its discussion of Presidential and judicial powers.  Lawmaking, in the Framers' view, encompassed "generally applicable rules of conduct governing future actions by private persons."  *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting). This was the legislative power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated."  THE FEDERALIST No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton).

198.    In the Supreme Court's own words, lawmaking was also the authority to "prescribe general rules for the government of society."  *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810); *see also* J. Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 22, p. 13 (1947) (Locke, Second Treatise); 1 W. Blackstone, Commentaries on the Laws of England 44 (1765).  Under this governing benchmark, forcing federal employees to get vaccinated easily qualifies as lawmaking.

199.    Just as the seizure of steel mills even for the production of wartime supplies constituted oxymoronic (and thus impermissible) Presidential law-making, so is the issuance of a vaccine mandate, no matter the governmental interests invoked.  The subject matter, under such circumstances, becomes irrelevant; and the procedure applied to achieve it becomes all-important.  The President does not get to issue edicts by circumventing Congress.  That is the very definition of a constitutional process-foul.

50

200.    As the Supreme Court reminded us in *Youngstown*, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* at 587.

201.    The Founders of our Constitution chose a system of government that put its faith in the constitutionally ensconced, structured, and systematized diffusion of power. Therefore, our Founders prevented the President from venturing outside his restricted Article II province.  Just as the States, Congress or the Federal Judiciary may not invade the President's preserve, he may not go beyond his own lane either—no matter the exigencies of the moment.  *See*, *e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (rebuffing congressional intrusion into the judicial sphere); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (stopping the federal courts from intruding into the Executive's domain).  Presidents are not potentates with limitless power and a divine mandate to act according to their own will by being accountable only to Heaven.  The Sun King's *L'état, c'est moi* might be a nice, if anachronistic, snippet of history but it is unsuited to being a part of our constitutional mosaic.

202.    The Presidential temptation to exceed his lawful domain, understandably, might be overwhelming and the public desire that he do so similarly pervasive and overpowering.  But those are also the occasions that the constitutional brakes are of the greatest necessity and consequence.  For otherwise, as Enlightenment philosophers onward have argued (and persuaded our Framers), Presidents would become autocrats; and their

autocracies might come to dominate every aspect of our Nation's public—and increasingly private—lives. *See* J. Locke, Second Treatise of Civil Government §§ 143–144, p. 72 (J. Gough ed. 1947); Montesquieu, Spirit of the Laws bk. XI, ch. 6, pp. 151–152 (O. Piest ed., T. Nugent transl. 1949); M. Vile, Constitutionalism and the Separation of Powers 72–73, 102 (2d ed. 1998).

203.    Then individual liberty, securing which is a vital constitutional ambition, would find no succor in our separation of powers. *See*, *e.g.*, *Bond I*, 564 U.S. at 222; THE FEDERALIST No. 47, at 326 (J. Cooke ed.1961) (J. Madison) ("Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control."). Our Constitution resolutely sets its face against that possibility.

204.    This means, for our purposes, that federal law-making is *solely* a congressional preserve. *See Youngstown*, 343 U.S. at 589 ("The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times."). The President has no unilateral power under Article II to issue a vaccine mandate any more than he has the authority to seize private property.

205.    It follows that the vaccine mandate contravenes the Tenth Amendment and the principles of federalism enshrined in the Constitution. Nor does anything in Article II give the President the power to issue a vaccine mandate.

206.    This mandate also exceeds the federal government's Commerce Clause authority because, under *Sebelius* and *Lopez*, this mandate does not concern channels of interstate commerce, persons or things in interstate commerce, and those activities that

substantially affect interstate commerce.  *See Sebelius*, 567 U.S. at 535–36; *United States v. Morrison*, 529 U.S. 598, 609 (2000); *Lopez*, 514 U.S. at 558–59.

207.    It is indisputable that "the power to regulate commerce, though broad indeed, has limits." *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968).  The taking or lack thereof of this vaccine is not an economic activity in the Commerce Clause sense any more than buying health insurance was so in *Sebelius*, 567 U.S. at 558, or having guns near schools was so in *Lopez*, 514 U.S. at 567.  Those federal laws did not survive Commerce Clause scrutiny.  Nor should this vaccine mandate.

208.    Not only is there nothing economic about the problem the President supposedly is trying to solve here—let alone, anything pertaining to *interstate* commerce— the vaccine mandate is not getting at regulating any activity either.  The Supreme Court's precedents make it abundantly clear that if the government is not regulating an existing activity, its Commerce Power is at an end.  *See*, *e.g.*, *Sebelius*, 567 U.S. at 551 ("As expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching 'activity.'  It is nearly impossible to avoid the word when quoting them."); *Lopez*, 514 U.S. at 560 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained"); *Perez v. United States*, 402 U.S. 146, 154 (1971) ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class") (cleaned up); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress

if it exerts a substantial economic effect on interstate commerce"); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937) ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control").

209.   In short, "[a]ccepting [Defendants' position] would give [the federal government] the ... license to regulate what we do *not* do, fundamentally changing the relation between the citizen and the [f]ederal [g]overnment." *Sebelius*, 567 U.S. at 554 (emphasis added).  And just to be perfectly clear, "[t]he Framers gave Congress the power to regulate commerce, not to compel it, and for over 200 years both our [Supreme Court's] decisions and Congress's actions have reflected this understanding." *Id.* at 555.

210.   The federal government never has been permitted to do anything as expansive, all-controlling, and draconian under the Commerce Clause as this vaccine mandate.  This mandate smacks of unprecedented federal intrusion into the lives of its citizens (even if they happen to work for the Feds).  After all, "the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent" for some federal action.  *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (cleaned up).

211.   No one should miss the fact that through parallel intrusions, the Executive is going after other citizens to fill their bodies with chemicals against their will.  By gaining

the pliancy of a defenseless bureaucracy, that totalitarian control of the rest of the country will be all the more achievable. This stratagem is straight out of the playbook of tyrants.

212.   Furthermore, this mandate undermines Oklahoma's sovereignty, laws, and public policy—and those of her sister States. This vaccine mandate takes over the sphere of public health, specifically COVID-19 vaccinations, with no limiting principle in sight. In the process of doing so, this mandate crushingly harms the security of Oklahoma and its residents because many members of the U.S. military, including the Oklahoma National Guard, prefer to sacrifice their federal employment instead of getting vaccinated. The vaccine mandate leaves Oklahoma unprotected and without security.

213.   Even assuming that some government is empowered to impose a vaccine mandate, that must be a police power reserved to the States. No entity within the federal government is entitled to issue a vaccine mandate. Any other approach would be tantamount to giving the federal government a blank check. Such a federal government would then be "everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." THE FEDERALIST No. 48, at 309 (J. Madison).

214.   For all these reasons, Defendants' vaccine mandate on federal employees exceeds federal power; it therefore should be invalidated.

### COUNT VI
### Non-Delegation Principle
### (Asserted Under the Separation of Powers and the Legislative and Executive Vesting Clauses of the U.S. Constitution)

215.   The allegations in the preceding paragraphs are reincorporated herein.

216.   In addition to violating the constitutional rights of States, this vaccine mandate also impinges on the separation of powers.

217.   The separation of powers and the Legislative and Executive Vesting Clauses in the Constitution, *see* U.S. Constitution Article I, Section 1, and Article II, Section 1, do not permit Congress to delegate the momentous question of vaccine mandate to the Executive.

218.   That question, as articulated earlier, is one of great political and economic significance and involves matters that go to the heart of Congress' explicit constitutional power to make certain rules concerning the military, to human dignity, to the individual's bodily integrity, and to the individual's right to refuse treatment.

219.   The Supreme Court has held that "Congress" may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935); *see also Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).  "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field v. Clark*, 143 U.S. 649, 692 (1892).

220.   Eager to preserve individual liberty, the Framers were concerned about an "excess of law-making," which James Madison (among others) believed was a "disease[] to which our governments are most liable."  THE FEDERALIST No. 62, at 378 (J. Madison); *see also* THE FEDERALIST No. 73, at 441–442 (A. Hamilton); Locke, Second Treatise § 143.

221.   Just to be clear, when Madison said that "the[] [three] departments [might] have no partial agency in, or no controul [*sic*] over the acts of each other," he was acknowledging only that the Constitution spelled out the limited ways in which the three branches would check and balance one another—Madison was not, nor could he be, approving what the Constitution had just repudiated: delegations, cross-delegations, or trades and exchanges of power.  *See* THE FEDERALIST No. 47, pp. 325-326 (J. Cooke ed. 1961); *see also* 2 Records of the Federal Convention of 1787, p. 77 (M. Farrand rev. 1966) (explaining that "experience has taught us a distrust" of the separation of powers, without more, as "a sufficient security to each [branch] [against] encroachments of the others."); *id.* ("[I]t is necessary to introduce such a balance of powers and interests, as will guarantee the provisions on paper.").

222.   When Madison noted "that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution, are subverted," he was making an obvious point—not suggesting that exchanging *some* of the constitutionally-enshrined powers among the branches was permissible.  *Id.*

223.   This is true for obvious reasons.  If a branch could delegate some of its powers to an actor within our overall constitutional schema, then why could a branch not delegate its powers to *extra*-constitutional actors?  And why should Congress be the only branch that is allowed to delegate its powers?  Nothing in the Constitution, as thus fallaciously understood, would restrict *those* moves either.

224.   As a consequence, a President easily could delegate his powers away to foreign states or even paramilitary actors; a Congress could delegate its powers to a State of its choice and the Senate could delegate its power to confirm judges to a tribal council in Oklahoma; and the Federal Judiciary could delegate its powers away to a special master plucked at random.   These moves would "make no [more] sense" than certain congressional delegations to the Executive.   Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

225.   Accountability would crater in the absence of the true tripartite form of government in which each branch stuck to its own powers and did not delegate its own powers or invade others' preserves.   Legislation, for all intents and purposes, would also become the creature of the Executive will—not a product of legislative decision-making. "And if laws could be simply declared by a single person, they would not be few in number, the product of widespread social consensus, likely to protect minority interests, or apt to provide stability and fair notice."   *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting) (citing THE FEDERALIST No. 47, at 303 (Madison); *id.*, No. 62, at 378 (same)).

226.   In addition, the expectation that laws be considered carefully, by different electorates subject to staggered terms in office, would resoundingly be defeated.   In Hamilton's words, "[t]he oftener the measure is brought under examination, the greater the diversity in the situations of those who are to examine it"—and "the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest."   THE FEDERALIST No. 73, at 443.

227.    Wise as the Founders were, they were not writing all these principles on a blank slate.  They were following the path laid down by Enlightenment thinkers from whom the Framing generation drew its inspiration.  *See*, *e.g.*, *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting).  Notable among them was John Locke, who took a decidedly separatist position on the diffusion of powers in our constitutional structure:

> The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others. The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be.

Locke, Second Treatise §141, at 71; *id*. at 87 ("The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other than what the positive grant conveyed, which, being only to make laws, and not to make legislators, the legislative can have no power to transfer their authority of making laws, and place it in other hands.").

Locke also answered the point—why does it matter who makes the laws?—raised by later critics of our original separation of powers, those who would comingle the powers granted the different branches.  Specifically, he reasoned that

> … when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them.

*Id*.  To paraphrase Locke, those delegations are simply illegitimate as a matter of political theory.  Locke went so far as to say that such laws would not bind the governed.  To our

Framers, those delegations would simply be unconstitutional, and thus inoperative, because they are fundamentally incompatible with the three "Vesting Clauses, and indeed the entire structure of the Constitution." Lawson, *supra*, at 340.

228. Viewed in historical context, this makes sense. As an early 19th century court explained, "[w]ithout a Constitution, the Legislature, like the British Parliament, would have been supreme, and without any other rule for its government than its will. The *only* purpose of a constitution was, therefore, to limit this [lawmaking] power by prescribed rules." *Hunt*, 2 Hill (SC) at 230 (Johnson, J.). The corollary of this principle is a simple one: "Every provision in the Constitution affecting the power of the Legislature" is also a "limit[a]ti[o]n[] [on] that power, unless it is otherwise expressed—and … in [nearly] every instance in which the Constitution has prescribed a rule in affirmative terms, without other qualification, the negative arises by necessary implication." *Id.* at 231 (Johnson, J.).

229. To be sure, Executive discretion to execute the laws is a different matter altogether from Executive law-making. "The whole theory of *lawful* congressional 'delegation,'" as Justice Scalia explained things, "is not that Congress is sometimes too busy or too divided, and can therefore assign its responsibility of making law to someone else"—those excuses obviously would be constitutionally unavailing—"but rather that a certain degree of discretion … *inheres* in most executive or judicial action, and it is up to Congress, by the relative specificity or generality of its statutory commands, to determine—up to a point—how small or how large that degree shall be." *Mistretta v. United States*, 488 U.S. 361, 417 (1989) (dissenting opinion); *id.* (Scalia, J., dissenting) (collecting permissible-delegation cases).

230.    "The *true* distinction," the Supreme Court noted 130 years ago, "is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law.  The first cannot be done; to the latter, no valid objection can be made." *Field*, 143 U.S. at 693–94 (cleaned up and emphasis added).

231.    As the *Field* Court also observed, "[h]alf the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that *the exercise of such discretion is the making of the law*." *Id*. at 694 (emphasis added).  But, as is soon explained, something as extraordinary as a vaccine mandate can only be lawmaking itself.

232.    Even with legislative acquiescence, the Executive may not act unilaterally in this space. *See Gundy*, 139 S. Ct. at 2131 (Alito, J., concurring in judgment) ("If a majority of this Court were willing to reconsider the approach [to the non-delegation principle] we have taken for the past 84 years, I would support that effort."); *id*. at 2131 (Gorsuch, J., dissenting) ("The Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty.").

233.    In this instance, the President has claimed the power to issue this vaccine mandate on the bases of 5 U.S.C. §§ 3301, 3302, and 7301.  As this Complaint already has discussed, not a single one of those provisions confers that authority on the President.  It is not even a close question.  One might even be forgiven for considering it a risible one.

234.   The delegation here fails because it is neither intelligible nor permissible, as Congress simply cannot delegate away its own powers on an issue as significant as a vaccine mandate on federal employees, and certainly not through the generalized and nebulous delegation upon which Defendants rely.  Nothing in any statute Congress has enacted gives the President any whisper of the authority to subject the federal workforce, including members of the military and the Oklahoma Air National Guard, to a vaccine mandate.  No such delegation can therefore be called intelligible or otherwise permissible.

235.   Moreover, under our Constitution's separation of powers, Congress categorically lacks the authority to delegate to other entities its lawmaking functions.  As the Supreme Court maintained almost two centuries ago, Congress is not empowered to "delegate ... powers which are strictly and exclusively legislative."  *Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825).

236.   It follows this vaccine mandate is lawmaking by Executive fiat rather than the execution of laws Congress has enacted.  Congress has enacted no laws authorizing, much less encouraging, the Executive to impose this vaccine mandate on federal employees.  Nor is it clear how a discrete, powerful, impactful, unprecedented, and extraordinary Executive action as a vaccine mandate could be spun as the routine, pedestrian execution of even important laws that Congress has taken the trouble to enact.  No.  It must either be a law enacted by Congress or not authoritative at all as a federal enactment.

237.   For all these reasons, even if Congress somehow *had* delegated to the Executive the power to issue this vaccine mandate on federal employees, the mandate still would be an unconstitutional delegation of legislative power.

238.   A mid-17[th] century English work had set forth this vision of separation of powers: "[W]hilst the *Supreamacy*, the *Power* to Judge the Law, and *Authority* to make new Lawes, are kept in *severall hands*, the known Law is *preserved*, but *united*, it is *vanished*, instantly thereupon, and *Arbytrary* and *Tyrannicall* power is introduced."  The Royalist's Defence 80 (1648).  This vision came from the mother country and took root here amidst strife, war, revolution, and the hard-won enshrinement of the rule of law.  It has taken us almost four centuries to be inspired, to be influenced, to find ourselves civically committed, and then to preserve a separation of powers scheme.  It would be injudicious to turn our backs on this old and faithful friend.

239.   As a result, this vaccine should be invalidated under the separation of powers and specifically, the non-delegation principle.

## COUNT VII
### Violation of Rights to Due Process, to Bodily Integrity, and to Refuse Medical Treatment
### (Asserted Under Fifth Amendment to the U.S. Constitution)

240.   The allegations in the preceding paragraphs are reincorporated herein.

241.   In light of the foregoing discussion, it is appropriate to note that even if this vaccine mandate were authorized by Congress or the States, it still would not pass constitutional muster.  That is because it violates various individual guarantees of the

Constitution, starting with the due process rights to bodily integrity and to refuse medical treatment.

242.    The Supreme Court has long maintained that "even [legitimate federal] power does not remove constitutional limitations safeguarding essential liberties." *Home Bldg. & Loan Assn. v. Blaisdell*, 290 U. S. 398, 290 U.S. 426 (1934).  Being made by the appropriate governmental authority is necessary but not sufficient for an official action to survive constitutional scrutiny; it still needs to conform to *other*—typically, civil liberties—provisions contained in the Constitution.  And as the Supreme Court rather recently reminded us, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).

243.    There is nothing novel about this realization and insight.  Almost seventy years ago, the Supreme Court also held (and has since reminded us) that the liberty interest in bodily integrity is protected by the Due Process Clauses of the Fifth and Fourteenth Amendments.  *See Albright v. Oliver*, 510 U.S. 266, 272 (1994); *Rochin v. California*, 342 U.S. 165, 173–74 (1952).

244.    Then-Judge Cardozo saw it as a fundamental principle that "[e]very human being of adult years and sound mind has a right to determine *what shall be done with his own body*." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–130, 105 N.E. 92, 93 (1914) (emphasis added).  While recognizing that this principle does not protect the "right [to commit] suicide," the Supreme Court has reaffirmed that this does encompass the "right to refuse treatment." *Vacco v. Quill*, 521 U.S. 793, 803 n.7 (1997).

245.   The Supreme Court has focused on the interplay between bodily integrity and medical treatment.  In a landmark opinion more than three decades ago, the Court held that "a competent person has a constitutionally protected liberty interest [under due process] in refusing unwanted medical treatment."  *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).  Even effective medical treatment could be rejected by an individual if she did not want it.  That determination went to the core of the individual's autonomy and her bodily integrity.

246.   This overall view has prevailed across the spectrum at the Supreme Court. As Justice Stevens once recognized, each and "[e]very violation of a person's bodily integrity is an invasion of his or her liberty."  *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part).  "The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death.  Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment."  *Id.* (footnote omitted).

247.   Forcing individuals to take vaccinations they do not want demeans and degrades them to a sub-human level by stripping them of their free will on a matter essential to their human dignity.  In Justice Stevens' words, "the supreme human dignity" includes the right to "be[] master of one's fate rather than a ward of the State;" and decisions taken in pursuance of that innate human dignity frequently "have been based" and are entitled to be based, "in part, on family traditions and deeply held beliefs that are an aspect of individual autonomy the government may not control."  *McDonald v. City of Chi.*, 561 U.S. 742, 886 (2010) (dissenting opinion).

248.    Therefore, it should come as no surprise that the Supreme Court, in its own words, "ha[s] [long] assumed, and strongly suggested, that the Due Process Clause [of the Fifth Amendment or of the Fourteenth Amendment] protects the [individual's] traditional right to refuse unwanted life saving medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Cruzan*, 497 U.S. at 278–79).

249.    A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229.  Surely, all these principles hold, *a fortiori*, for potentially side effects-laden or ineffective medical intrusion—like a COVID-19 vaccine—into a person's body.

250.    The individual also has a property interest in her own federal employment when she has a "legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972).  As the source of such expectations generally is positive law, it is helpful to appreciate that under federal law, federal employment as a career official generally is an enduring one, thus conferring expectations of longevity and durability on its holders.  *See*, *e.g.*, 5 U.S.C. § 1101 *et seq*.  Certainly, requirements to vaccinate are not supposed to get in the way of continuing to thus serve (as Counts I—III show).

251.    All these principles align with the unconstitutional-conditions doctrine, under which the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Id.* at 597; *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions

doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

252.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; consequently, the State has standing to bring this cause of action in federal court. Individual Plaintiffs too have standing to bring this cause of action because this mandate adversely affects them as private individuals.

253.    Assembling these principles, the due process rights to bodily integrity and to refuse medical treatment survive through, and perhaps are most necessary during, grave crises. *See Does 1–3 v. Mills*, 2021 WL 5027177, *3 (2021) (Gorsuch, J. dissenting) ("If human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion) ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."); *United States v. Robel*, 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of [health and safety], we would sanction the subversion of one of those liberties … which makes the [health and safety] of the Nation worthwhile"); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963) ("The imperative necessity for

safeguarding these rights … under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit government action"); *Ex parte Milligan*, 71 U.S. 2, 126 (1866) ("[I]t is insisted that the safety of the country in time of war demands that [a] broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation. *Happily, it is not so*.") (emphasis added); *Marbury v. Madison*, 1 Cranch 137, 163 (1803) ("[t]he very essence of civil liberty [lies] in the right of every individual to claim the protection of the laws, *whenever* he receives an injury.") (emphasis added). A pandemic is such a grave crisis but it is no reason to deviate from the constitutional commitment to our civil liberties.

254.    This mandate would profoundly have appalled and distressed the Founders. As Justice Douglas characterized events more than half a century ago, this is part of "an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps." *Osborn v. United States*, 385 U.S. 323, 343 (1966) (dissenting opinion).  Of course, "[t]aken individually, each step may be of little consequence.  But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will." *Id*. (Douglas, J., dissenting).

255.    Defendants' vaccine mandate violates federal employees' constitutional rights—under due process—to bodily integrity and to refuse medical treatment.  Due

process encompasses the right to refuse vaccinations.  Vaccinations are supposed to immunize the individual being vaccinated.  Being vaccinated does not stop *anyone* from being a carrier of COVID-19.  Nor does this mandate at all account for natural immunity, which could make this infliction of the needle stupendously moot.  One-size-fits-all blunderbuss impositions are impermissible where important constitutional rights (like the rights to bodily integrity and to refuse treatment) are concerned.  *See generally Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2385–89 (2021).  Here, the rights to bodily integrity and to refuse even life-saving medical treatment merge with the individual's property interest in her own employment, which she certainly has on account of her "legitimate claim" to such employment, *Roth*, 408 U.S. at 577, and which the federal government is threatening to take away.

256.   The federal government has no valid interest in thus interfering with an individual's bodily integrity and her property interest in her employment.  The fact that this imposition concerns federal employees makes no constitutionally material difference.  They do not doff their legal and constitutional rights when they take up government employment.  *See*, *e.g.*, *Waters v. Churchill*, 511 U.S. 661, 674 (1994).  Further, the federal government here is acting as sovereign, not as a market participant.  *See Reeves, Inc. v. Stake*, 447 U.S. 429, 436–37, 440 (1980); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807–09 (1976).  And forcing a mandate on federal employees will not, contrary to the Executive's claim, "halt the spread of [COVID-19]" and may well cause side effects. 86 F.R. 50989.

257.    Tellingly, the fact that the President has forced vaccine mandates on federal contractors' employees and people working at large businesses and is looking to extend it to people working at small businesses as well reveals that his motive and the purpose underlying this mandate is not to keep the federal government running—it is to exert totalitarian control over the lives of Americans.  That cannot be a compelling, rational, or even valid governmental interest in any universe.

258.    Accordingly, Defendants' vaccine mandate violates the Fifth Amendment to the Constitution and is impermissible.

## COUNT VIII
### This Vaccine Mandate is a Constitutionally Infirm Seizure of the Individual Effectuated by Means of Unconstitutional Conditions
### (Asserted Under the Fourth Amendment to the U.S. Constitution)

259.    The allegations in the preceding paragraphs are reincorporated herein.

260.    The Fourth Amendment forbids "unreasonable searches and seizures" that are conducted by the government.  Earlier this year, the Supreme Court reaffirmed that "the 'seizure' of a 'person'" may "take the form of … a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

261.    Forcible vaccinations have been treated as "search[es] and seizure[s]" for the Fourth Amendment purposes. *See*, *e.g.*, *B.A.B., Jr. v. Board of Educ. of City of St. Louis*, 698 F.3d 1037, 1039–40 (8th Cir. 2012) (rejecting Fourth Amendment claim on other grounds).

262.    Understandably so.  As the Supreme Court articulated more than three

decades ago, "[t]he initial detention necessary to [forcibly vaccinate the individual] may be a seizure of the person," *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616 (1989) (citing *Cupp v. Murphy*, 412 U.S. 291, 294–95 (1973); *Davis v. Mississippi*, 394 U.S. 721, 726–27 (1969))—"if the detention amounts to a meaningful interference with [the individual's] freedom of movement," *id*. (citing *INS v. Delgado*, 466 U.S. 210, 215 (1984); *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984)).

263.    Under the Supreme Court's precedents, a "compelled intrusio[n] into the body," *Schmerber v. California*, 384 U.S. 757, 767–68 (1966), one "penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable" under the Fourth Amendment, *Skinner*, 489 U.S. at 616.

264.    Such searches and seizures "implicate[]" fundamental "privacy interests" and "concern[] … bodily integrity." *Id*. at 616–17.  The COVID-19 vaccination is not just a beneath-the-skin penetration (as the intrusion in *Skinner* is).  Instead, this vaccination concerns into-the-bloodstream intrusion by pumping chemicals into the physical person of an unwilling individual.

265.    Since "[o]btaining and examining the evidence" of a person's refusal to vaccinate would count as "a search" and a seizure within the meaning of the Fourth Amendment, surely so does a mandate to get vaccinated.  *Skinner*, 489 U.S. at 616 (citing *Cupp*, 412 U.S. at 295; *Dionisio*, 410 U.S. at 8, 13–14).  *A fortiori*, the search and seizure here is unreasonable and unconstitutional.

266.    A private entity "that complies with [the governmental demands of seizing the person of that entity's employee] does so by compulsion of sovereign authority, and

the lawfulness of its acts is controlled by the Fourth Amendment." *Id*. at 614. That is never truer than when the government "encourage[s], endorse[s], and participat[es]" in the seizure. *Id*. at 615–16. This principle holds true when the government sets unconstitutional conditions to the enjoyment of a benefit. "[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595, 606 (2013); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("*FAIR*"). In essence, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected [right] even if he has no entitlement to that benefit." *Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up).

267.    The vaccine mandate is an unconstitutional search and seizure of the person under the Fourth Amendment. In its search and seizure of unvaccinated workers, it restrains the liberty of the person.  *See Torres*, 141 S. Ct. at 995; *Terry*, 392 U.S. at 19 n.16.  This mandate forcibly intrudes into the physical person of the federal employee; it penetrates into her bloodstream.  *See Skinner*, 489 U.S. at 616.

268.    This intrusion violates the person's privacy and bodily integrity.  Society undoubtedly recognizes the individual's right to avoid such a compelled intrusion as reasonable.  *See California v. Greenwood*, 486 U.S. 35, 43 (1988); *Jacobsen*, 466 U.S. at 113.

269.    The federal government is invoking its "sovereign authority" to impose this unconstitutional seizure on the federal employees, *Skinner*, 489 U.S. at 616, by

"encourag[ing], endors[ing], and participat[ing]" in this search and seizure of the individual, *id*. at 615–16.

270.    Through this mandate, the federal government also sets unconstitutional conditions on the federal employees' jobs. *See FAIR*, 547 U.S. at 59.   It is of no consequence whether those employees had any legal right to such employment in the first place. *See Umbehr*, 518 U.S. at 674.

271.    The federal government's interests do not qualify as rational, much less as compelling.   As earlier discussed, the fact that the President has forced vaccine mandates on federal contractors' employees and people working at large businesses and is seeking to extend it to people working at small businesses as well reveals that his motive and this mandate's purpose is not to keep the federal government running—it is to exert absolutist control over Americans' private and professional lives.   That cannot be a compelling, rational, or even valid governmental interest.

272.    As a result, the mandate violates the Fourth Amendment.   It should therefore be invalidated.

### COUNT IX
### Violation of the Free Exercise Clause
### (Asserted Under First Amendment to the U.S. Constitution)

273.    The allegations in the preceding paragraphs are reincorporated herein.

274.    The Fourth Amendment is not the only individual rights provision of the Constitution this vaccine mandate violates.

275. The Supreme Court recently reaffirmed that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1876 (2021). To this end, courts have held that the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id*. at 1877.

276. Under this line of precedent, a law will not be considered generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id*. (cleaned up). A corollary is that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id*.

277. Based on these principles, the Supreme Court has held laws not generally applicable under the following circumstances: the "good cause" standard to receive unemployment benefits (due to religious reasons) enabled the government to grant exemptions based on the individual circumstances underlying each application, *see Sherbert v. Verner*, 374 U.S. 398, 401 n.4 (1963); ordinances prohibiting animal sacrifice surgically targeted religion because they "did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants," which all posed public-health risks, *see Fulton*, 141 S. Ct. at 1877 (referring to *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 544–45 (1993)); and city contracts requiring adoption agencies to be open on

equal terms to straight and gay prospective foster parents but permitting exemptions at the "sole discretion of" the government decision-maker, *id.* at 1879.

278.    The Supreme Court held last Term that, whether or not an exemption actually is granted, "[t]he [very] creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invite[s] the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* This was in keeping with the Court's time-honored precedents maintaining that "[t]he Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Lukumi*, 508 U.S. at 533, 542).

279.    At this point in the analysis, the governmental policy will survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Lukumi*, 508 U.S. at 546. Courts must not examine any of the asserted interests at a high level of generality but instead must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006).

280.    Governmental interests that might, in the abstract, appear important will not necessarily justify the denial of a religious exemption in a given case. And the burden decidedly rests on the government, for "[t]he [very] creation of a system of exceptions …

undermines the [government's] contention that its … policies can brook no departures." *Fulton*, 141 S. Ct. at 1882.

281.   In recent years, the Supreme Court has not upheld a single governmental interest in the face of such searing strict-scrutiny analysis.  *See*, *e.g.*, *id.* at 1881–82; *Trinity Lutheran*, 137 S. Ct. at 2024.  The Court's actions speak volumes.  The Court has pretty much suggested that it is inconceivable when successful governmental interests could even exist.  At this step of the analysis, such invocations of governmental interests will be "moribund" and deemed to "retain[] [little] vitality."  *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).

282.   On the whole, then, "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'"  *Trinity Lutheran*, 137 S. Ct. at 2019 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)).

283.   A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.  Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; accordingly, the State has standing to bring this cause of action in federal court.  Individual Plaintiffs too have standing to bring this cause of action because this mandate adversely affects them as private individuals.

284.   The vaccine mandate is undermining the sincerely held religious beliefs of Oklahoma residents and at least some individual Plaintiffs.  This mandate is not a law of

76

general applicability because it contains exemptions that almost certainly will be unavailable to some individual Plaintiffs. Specifically, although EO 14043 does not even discuss religious exemptions, the SFWTF says only that a religious exemption *might* apply. *See* Vaccinations, Safer Federal Work Force, https://www.saferfederalworkforce.gov/faq/vaccinations/. It adds: "Determining whether an exception is legally required will include consideration of factors such as the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations, including protecting other agency employees and the public from COVID-19." *Id.* This non-committal and uncertain language gives Plaintiffs no assurance whatsoever. To quote a famous line from the Supreme Court's annals, "[l]iberty finds no refuge in a jurisprudence of doubt." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 844 (1992) (joint opinion).

285. Since the government may not force persons to choose between their governmental participation and religious vocation, there is no reason consistent with the Free Exercise Clause that the government may compel its employees to choose between their public employment and the dictates of their faith either. *See McDaniel*, 435 U.S. at 626–27; *id.* at 634 (Brennan, J., concurring in judgment) ("[B]ecause the challenged provision requires [a person] to purchase his right to engage in the ministry by sacrificing his candidacy it impairs the free exercise of his religion.").

286. Nor is there any compelling, or even rational, justification for the denial of such a religious exemption. In fact, the federal government's utter failure to account for

the individual employee's possible natural immunity is bewildering—and it undercuts any justification the federal government might offer.

287.    Accordingly, the vaccine mandate violates private Plaintiffs' Free Exercise Clause rights.   It should be struck down on that basis.

**COUNT X**
**Imposition of a Substantial Burden on Exercise of Religion**
**(Asserted Under RFRA)**

288.    The allegations in the preceding paragraphs are reincorporated herein.

289.    The Free Exercise Clause is not the only religion-related legal provision this vaccine mandate violates.

290.    RFRA's text is the optimal indicator of its scope.   *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985).   That text precludes the federal government from "substantially burden[ing] a person's exercise of religion *even if the burden results from a rule of general applicability*," 42 U.S.C. § 2000bb-1(a) (emphasis added).

291.    RFRA also instructs courts to interpret the term "substantial burden" in a way that provides "broad protection of religious exercise, to the maximum extent permitted by [its] terms … and the Constitution." *Id.* §2000cc-3(g).   Under RFRA, a burden counts as "substantial" even if it "results from a rule of general applicability." § 2000bb-1(a).

292.    If the federal government does substantially burden a person's exercise of religion, that person is entitled to an exemption from the governmental policy *unless* the government "demonstrates that application of the burden to the person—(1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b).

293.    A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607.  Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; the State, therefore, has standing to bring this cause of action in federal court.  Individual Plaintiffs too have standing to bring this cause of action because this mandate adversely affects them as private individuals.

294.    The vaccine mandate is undermining the sincerely held religious beliefs of Oklahoma residents who happen to be federal employees.  This mandate imposes a substantial burden on their exercise of religion and is unsupported by any compelling governmental interests.  These federal employees are being forced to choose between following their faith as best as they see it and remaining federal employees.  Nor is it the least restrictive means of furthering any valid governmental interest.

295.    Therefore, the vaccine mandate violates individual Plaintiffs' RFRA rights.

## COUNT XI
**President's Obligation to Faithfully Enforce the Laws Congress Has Enacted
(Asserted Under the Separation of Powers and the Take Care Clause of the U.S.
Constitution, Art. II, § 3.)**

296.    The allegations in the preceding paragraphs are reincorporated herein.

297.    In light of the legal violations already discussed, it is unsurprising that the President is also violating the separation of powers and his Take Care Clause obligation

because he is trying to establish a wholly unlawful regime.  He is not enforcing the law in the slightest.

298.    Even before the United States' Founding, people in the colonies were troubled by the British Crown's proclivity to neglect enforcing laws that the Crown did not care for as well as to claim statutory authority to act that the Parliament never had committed to the Crown.  *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 118 (2020).  Regarded as the "dispensing power"—the power to dispense with enforcing the corpus of laws enacted by the legislature—this executive conceit was abhorrent to everyday colonists as well as to believers in the rule of law.

299.    The Stuart monarch King James II was not the first among the sovereigns ruling the British Isles to invoke the dispensing power.  *See* Dennis Dixon, *Godden v Hales Revisited—James II and the Dispensing Power*, 27 J. Legal Hist. 129, 136 (2006).  But he *is* the one most infamous for doing so because he began to use it most frequently and on significant matters.  *See id*. at 135–36.  James II badly overdid things, which earned him the indignation of Parliament and the ire of his subjects.

300.    Notably, King James II "used [the dispensing power] to systematically dispense with a vast array of religious legislation and rules governing the universities.  There was no 'emerging inconvenience' to justify the use of the power."  *Id*. at 136.  Scandalizing and dismaying Protestants, James II kept dispensing his fellow Catholics from the requirements of the Test Acts of 1673 and 1678 that Parliament had enacted.  *See id*. at 129–30.  This led to the Glorious Revolution.  *See* Carolyn A. Edie, *Revolution and*

*the Rule of Law: The End of the Dispensing Power, 1689*, 10 Eighteenth-Century Stud. 434 (1977); Carolyn A. Edie, *Tactics and Strategies: Parliament's Attack Upon the Royal Dispensing Power 1597-1689*, 29 Am. J. Legal Hist. 197 (1985).

301.   King James II's tendency to avoid enforcing laws enacted by Parliament influenced the Framers of our Constitution to ensure that our President would not get away with the same behavior. *See* R. Delahunty & J. Yoo, *supra*, at 781, 797–98 & n.95, 804–09. Thus the Framers limited the President's inherent executive power. *See id.*

302.   The applicable principle is a simple one: "The duty to execute the laws faithfully means that the President may not—whether by revocation, suspension, dispensation, inaction, or otherwise—fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." Christopher N. May, *Presidential Defiance of Unconstitutional Laws: Reviving the Royal Prerogative*, 21 Hastings Const. L.Q. 865, 873–74 (1994).

303.   Not only did the Framers of the Constitution design a separation of powers fastidiously proscribing the Executive from ignoring or violating laws he did not like, the constitutional requirement that the President must "'take care that the laws be faithfully executed'" too "means that the president is not permitted to dispense with or suspend statutes" in any way, shape, or form. *Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) (quoting Michael Stokes Paulsen, et al., *The Constitution of the United States* 317 (Robert C. Clark et al. eds., 2d ed. 2013)).

304.   Moreover, the President's Take Care Clause obligation is incompatible with the notion that he could exceed the authority Congress had committed to him. *See*

*Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); Joseph Story, Commentaries on the Constitution of the United States 316 (1833) ("[T]he duty imposed upon [the President] to take care, that the laws be faithfully executed, follows out the strong injunctions of his oath of office, that he will 'preserve, protect, and defend the constitution.' The great object of the executive department is to accomplish this purpose; and without it, be the form of government whatever it may, it will be utterly worthless for offence, or defence; for the redress of grievances, or the protection of rights; for the happiness, or good order, or safety of the people.").

305.   To put it succinctly, significant evidence suggests that the Committee of Detail at the Philadelphia Convention in the summer of 1787 "added the requirement that the President 'take care' that the laws be 'faithfully' executed" out of a "desire to prevent the President from declaring that his executive power granted him the ability not only to enforce federal law, but also to suspend federal law or suspend the execution of it."  Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 Yale L.J. 541, 620 (1994).

306.   As far as the Supreme Court is concerned, the President has a "constitutionally appointed duty" to obey the laws enacted by Congress.  *Olson*, 487 U.S. at 689–90.  Over a long period of time, the Court and individual Justices have made this same point.  *See*, *e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2228 (2020) (Kagan, J., concurring in part) ("To begin with, the provision—'he shall take Care that the Laws be faithfully executed'—speaks of *duty*, not *power*.") (emphases added); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982) ("The Constitution

82

imposes on the President the *duty* to take Care that the Laws be faithfully executed.")) (cleaned up and emphasis added); *Myers v. United States*, 272 U.S. 52, 117 (1926) ("[James] Madison and his associates in the discussion in the House dwelt at length upon the necessity there was for construing article 2 to give the President the sole power of removal in his responsibility for the conduct of the executive branch, and enforced this by emphasizing his *duty* expressly declared in the third section of the article to take care that the laws be faithfully executed.") (cleaned up and emphasis added); Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1911 (2014) ("To be sure, the President has the duty to take care that the laws be faithfully executed.").

307.    The original meaning of the Take Care Clause supports the same proposition. *See Texas v. United States*, No. 6:21-cv-00016, 2021 WL 3683913, at \*39 nn. 41–43 (S.D. Tex. Aug. 19, 2021) (explaining the original meaning of the Take Care Clause).  To that end, the contemporary meaning of "care" was "[r]egard; charge; heed in order to protection and preservation."  Samuel Johnson, A Dictionary of the English Language (1755), https://johnsonsdictionaryonline.com/1755/care_ns.  A related definition of "care" had it pegged as "[c]harge or oversight, implying concern for safety and prosperity."  Noah Webster, American Dictionary of the English Language (1828), http://webstersdictionary1828.com/Dictionary/care.  For its part, "faithfully" was to be defined as "[w]ithout failure of performance; honestly; exactly."  Johnson, *supra*, https://johnsonsdictionaryonline.com/1755/faithfully_adv.  It also meant "[w]ith strict adherence       to       allegiance       and       duty."       Webster,       *supra*,

http://webstersdictionary1828.com/Dictionary/faithfully. Finally, "execute" meant: "To put in act; to do what is planned or determined." Johnson, *supra*, https://johnsonsdictionaryonline.com/1755/execute_va. "Execute" could also be defined as: "To carry into effect; as, to execute law or justice." Webster, *supra*, http://webstersdictionary1828.com/Dictionary/execute.

308. "The Take Care Clause, coupled with related constitutional provisions, establishes," it follows, "that the President has a duty to enforce the laws. The Constitution confers no express or implied power or authority not to enforce the laws." *See* R. Delahunty & J. Yoo, *supra*, at 856.

309. A State has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. Oklahoma seeks to protect its residents' health and well-being from the vaccine mandate; thus, the State has standing to bring this cause of action in federal court. Individual Plaintiffs too have standing to bring this cause of action because this mandate adversely affects them as private individuals.

310. The President is required to conform to the laws enacted by Congress unless the Constitution confers the power on him directly. Here, as explained earlier, Congress has not authorized the President to issue this vaccine mandate and the President has no independent constitutional authority to impose this mandate either. Yet again, the President and his Administration are flouting the law. *See* Compl., Doc. No. 1, 5:21-cv-01069-G (W.D. Okla. 2021).

311.    Consequently, the President's actions here are antithetical to his taking care that the laws enacted by Congress are faithfully executed.  He is not even executing the laws, much less faithfully.  He is breaking them.  He and the other Defendants, therefore, are in violation of the separation of powers and the Take Care Clause of the Constitution.

312.    This vaccine mandate should therefore be invalidated; and Defendants should be enjoined from enforcing it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a)      Declaring the vaccine mandate unlawful under 5 U.S.C. § 3301;

b)      Declaring the vaccine mandate unlawful under 5 U.S.C. § 3302;

c)      Declaring the vaccine mandate unlawful under 5 U.S.C. § 7301;

d)      Declaring the vaccine mandate unlawful under the APA as an agency action not in accordance with law and in excess of authority as well as one that is arbitrary and capricious;

e)      Declaring the vaccine mandate unconstitutional because the Constitution does not confer the federal government the authority to issue this vaccine mandate under its federalism provisions or Article II;

f)      Declaring the vaccine mandate unconstitutional under the Constitution's separation of powers and the non-delegation principle;

g)      Declaring the vaccine mandate unconstitutional under the Fifth Amendment's Due Process Clause;

h)     Declaring the vaccine mandate unconstitutional under the Fourth Amendment as an unreasonable search and seizure;

i)     Declaring unconstitutional under the Free Exercise Clause of the First Amendment the vaccine mandate;

j)     Declaring unlawful under RFRA the vaccine mandate;

k)     Declaring the vaccine mandate unconstitutional under the Constitution's separation of powers and the Take Care Clause;

l)     Awarding Plaintiffs costs of litigation, including reasonable attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412;

m)     Granting a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining Defendants from enforcing the vaccine mandate;

n)     Enjoining Defendants from withholding federal funding from Oklahoma National Guard or its members; and

o)     Granting any and all other such relief as the Court finds appropriate.

Respectfully submitted,

*s/ Mithun Mansinghani*
Mithun Mansinghani
 *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Mithun.mansinghani@oag.ok.gov

Gene C. Schaerr*
H. Christopher Bartolomucci*
Riddhi Dasgupta*
Brian J. Field*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
sdasgupta@schaerr-jaffe.com
bfield@schaerr-jaffe.com
* *Pro hac vice* motions forthcoming

*Counsel for Plaintiffs The State of Oklahoma; J. Kevin Stitt, Governor of Oklahoma; and John M. O'Connor, Attorney General of Oklahoma*

Dated:  December 2, 2021