# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, *et al.*,

<div style="text-align:center">*Plaintiffs*,</div>

v.

JOSEPH R. BIDEN, JR., in his official capacity as
President of the United States, *et al.*,

<div style="text-align:center">*Defendants*.</div>

Case No: 5:21-cv-01136-F

## PLAINTIFFS' EMERGENCY MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................ii

BACKGROUND ...................................................................................................... 2

ARGUMENT............................................................................................................ 4

I.     Plaintiffs Have Standing to Sue in Federal Court; and, in the Absence
of a Preliminary Injunction, Will Suffer Irreparable Harm. ............................. 5

II.    Plaintiffs Are Likely to Succeed on the Merits.................................................. 7

      A.    The Vaccine Mandate Exceeds the President's Statutory Authority. ...... 7

            1.   This Mandate is Not Authorized by 5 U.S.C. § 3301. ...................... 7

            2.   This Vaccine Mandate is Unsupported by 5 U.S.C. § 3302. ........... 10

            3.   This Vaccine Mandate Finds No Support in 5 U.S.C. § 7301. ........ 11

      B.    The Mandate Violates the Administrative Procedure Act ("APA"). ..... 14

      C.    The Mandate Contravenes the Tenth Amendment and Other
Federalism Provisions in the Constitution. ............................................ 17

      D.    This Mandate Violates the Constitution's Non-Delegation Principle.... 20

      E.    The Vaccine Mandate is an Unreasonable Search and Seizure
Under the Fourth Amendment. ................................................................ 20

      F.    The Mandate Violates the President's Obligation to Faithfully
Enforce the Constitution As Well As the Laws Congress Has
Enacted, Under the Separation of Powers and the Take Care
Clause of the U.S. Constitution. ............................................................. 22

III.   The Balance of the Equities as well as the Public Interest Counsel
in Favor of Preliminary Injunction Here............................................................ 24

IV.   Under Rule 65, No Bond Should Be Required Here. ........................................ 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ............................ 20

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485 (2021) .......... 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) .......... 5, 6

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................ 24

*American Ins. Assn. v. Garamendi*, 539 U.S. 396 (2003) ................................................ 19

*B.A.B., Jr. v. Board of Educ. of City of St. Louis*, 698 F.3d 1037 (8th Cir. 2012) ........... 21

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983) .............. 15

*Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668 (1996) ........................... 22, 23

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................... 17, 18

*BST Holdings LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ........................................ 14, 20

*California v. Greenwood*, 486 U.S. 35 (1988) ................................................................. 22

*Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321 (D.D.C. 2015) .......................... 24

*Deerfield Med. Ctr. v. Deerfield Beach*, 61 F.2d 328 (5th Cir. 1981) ............................... 6

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ......................................... 15, 17

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .................................... 15, 16

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
   269 F.3d 1149 (10th Cir. 2001) ...................................................................................... 6

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................................. 9

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ....................................................................... 17

*Gundy v. United States*, 139 S. Ct. 2116 (2019) .............................................................. 20

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ......................................................................... 19

*In re Generation Res. Holding Co., LLC*, 964 F.3d 958 (10th Cir. 2020) ....................... 12

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) .............................................................. 18

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993) ........ 12

*Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595 (2013) ................................. 22

*Lehman v. Nakshian*, 453 U.S. 156 (1981) ........................................................................ 6

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**

*Louisiana v. Becerra*, Case No. 3:21-CV-03970, 2021 WL 5609846
  (W.D. La., Nov. 30, 2021) ........................................... 17

*Maryland v. Wirtz*, 392 U.S. 183 (1968 ........................................... 20

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................... 5

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 15, 16

*Myers v. United States*, 272 U.S. 52 (1926) ........................................... 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ......... 16

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) . 13, 19, 20

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ........................................... 24

*Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953 (8th Cir. 2017) ............... 25

*Printz v. United States*, 521 U.S. 898 (1997) ........................................... 18

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ........................................... 24

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .......... 22, 23

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) ........................................... 8

*Schmerber v. California*, 384 U.S. 757 (1966) ........................................... 21

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) ........................................... 23

*Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989) ................. 21, 22

*Terry v. Ohio*, 392 U.S. 1 (1968) ........................................... 21, 22

*Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) ................................. 23

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ........................................... 21, 22

*United States v. Dalm*, 494 U.S. 596 (1990) ........................................... 6

*United States v. Jacobsen*, 466 U.S. 109 (1984) ........................................... 22

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................... 20

*United States v. Morrison*, 529 U.S. 598 (2000). ........................................... 20

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ........................................... 24

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ........................................... 9

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**

*Vencor, Inc. v. Webb*, 829 F. Supp. 244 (N.D. Ill. 1993) ................................. 25

*West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991) ....................... 13

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ............................. 9

*Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202 (10th Cir. 2003) ............... 25

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................. 5

*Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018) ......................... 13

*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008) .......... 6

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................. 18, 19

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ................................. 19

*Zucht v. King*, 260 U.S. 174 (1922) ................................................................ 18

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 14 ............................................................................. 9

U.S. Constitution, Article I, Section 8, Clause 3 ............................................... 19

U.S. Constitution, Article II, Section 3 ............................................................. 23

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................. 14, 15

5 U.S.C. § 706(2)(A), (C) ................................................................................ 14

5 U.S.C. § 3301 ....................................................................................... passim

5 U.S.C. § 3302 ....................................................................................... passim

5 U.S.C. § 7301 ....................................................................................... passim

Okla. Stat. tit. 68, § 2355(E) ............................................................................. 6

**Rules and Regulations**

COVID-19 Vaccination and Testing; Emergency Temporary Standard,
  86 Fed. Reg. 68560 (Dec. 3, 2021) ............................................................... 3

Fed. R. Civ. P. 65(c) ....................................................................................... 25

# TABLE OF AUTHORITIES (cont'd)

**Other Authorities**

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ................. 8, 10, 12

Lloyd J. Austin, III, U.S. Sec'y of Defense, Memorandum, *Coronavirus Disease 2019 Vaccination for Members of the National Guard and the Ready Reserve* (Nov. 20, 2021) ............................................................................... 4, 5

President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the COVID-19 Pandemic, BRIEFING ROOM (Sept. 9, 2021) .................................... 3

Exec. Order No. 12564, *Drug-Free Federal Workplace*, 51 Fed. Reg. 32889 (Sept. 15, 1986) ............................................................ 13

Exec. Order No. 12674, *Principles of Ethical Conduct for Government Officers and Employees*, Apr. 12, 1989, 54 Fed. Reg. 15159, *as amended by* Exec. Order No. 12731, 55 Fed. Reg. 42547 (Oct. 17, 1990) ............... 13

Exec. Order No. 13058, *Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace*, 62 Fed. Reg. 43451 (Aug. 9, 1997) ................................................................. 13

Exec. Order 13991, *Protecting the Federal Workforce and Requiring Mask-Wearing*, 86 Fed. Reg. 7045 (Jan. 25, 2021) ......................................... 3

Exec. Order No. 14043, *Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*, 86 Fed. Reg. 50989 (Sept. 9, 2021) .......................... 1, 2, 12, 14

THE FEDERALIST No. 45 (James Madison) (Clinton Rossiter ed., 2003) ......................... 18

THE FEDERALIST No. 47 (James Madison) (Clinton Rossiter ed., 2003) .......................... 17

THE FEDERALIST No. 70 (Alexander Hamilton) (J. Cooke ed. 1961) .............................. 19

Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?,* NEWSWEEK (Sept. 10, 2021) ........................................ 2

Ellie Kaufman & Oren Liebermann, *Pentagon denies Oklahoma governor's request and insists National Guard members must be vaccinated*, CNN (Nov. 29, 2021) ......................................................................... 4

Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907 (2014) .......................................................... 24

JOHN LOCKE, SECOND TREATISE OF GOVERNMENT §§ 143–144 (J. Gough ed. 1947) ..... 19

# TABLE OF AUTHORITIES (cont'd)

Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* (2020) ........................................... 23

MERRIAM-WEBSTER DICTIONARY ........................................ 8, 10, 12

XI MONTESQUIEU, THE SPIRIT OF LAWS (O. Piest ed., T. Nugent transl. 1949).............. 19

Michael Stokes Paulsen, et al., *The Constitution of the United States* (Robert C. Clark et al. eds., 2d ed. 2013)........................................ 23

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231 (2001)...................................... 19

Presidential Memorandum: *Establishing Policies for Addressing Domestic Violence in the Federal Workplace*, 77 Fed. Reg. 24339 (Apr. 18, 2012) .................... 14

Jen Psaki, Press Briefing by Press Secretary Jen Psaki, BRIEFING ROOM (July 23, 2021) ........................................................... 2

Safer Federal Workforce Taskforce, *Safer Federal Workforce: Vaccinations* ............... 2, 3

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ................................ 8, 9

Jennifer Steinhauer, *The U.S. Army secretary to National Guard members who resist the vaccines: Prepare for discipline*, N.Y. TIMES, Nov. 18, 2021 ............ 4, 6

President Biden, speaking through an executive order ("EO") and following up via guidance from an Executive Branch task force, unilaterally has commanded federal employees to get vaccinated against COVID-19 or lose their jobs ("vaccine mandate"). *See* Exec. Order No. 14043, *Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*, 86 Fed. Reg. 50989 (Sept. 9, 2021) ("EO 14043") (Exhibit 1); Vaccinations, Safer Federal Workforce, https://www.saferfederalworkforce.gov/faq/vaccinations/. This mandate tries to pump chemicals into the bloodstreams of as many unwilling Americans as possible. It is sanctioned neither by federal law nor by the Constitution.

To elaborate, the ordinary, contemporary meanings of the statutory provisions under which the Executive claims the authority to issue this mandate—5 U.S.C. §§ 3301, 3302, and 7301—do not come close to so authorizing. It follows that the mandate exceeds Executive authority under the Administrative Procedure Act ("APA"). This mandate is also arbitrary and capricious under the APA because it does not mention, much less explain or consider, the costs it inflicts on the parties subjected to it or other important considerations. Furthermore, this mandate usurps the States' police power of regulating public health and violates the Tenth Amendment and other federalism provisions of our Constitution. It also violates the non-delegation principle undergirding our separation of powers. Because Plaintiffs amply have satisfied all the conditions to obtain a preliminary injunction, this mandate's enforcement should be enjoined.[1]

---

[1] The grounds for relief stated in this Motion should not be construed as precluding judicial consideration of any of the grounds stated in the Complaint or any grounds that might occur to the Court or be stated in an amended Complaint.

## BACKGROUND

On September 9 of this year, the President of the United States unilaterally issued a mandate compelling federal employees to either receive a COVID-19 vaccine or lose their jobs (the "vaccine mandate"). *See* EO 14043. EO 14043 invoked 5 U.S.C. §§ 3301, 3302, and 7301 in support of the Executive's authority to so command. This mandate fails to exempt federal employees even if they have natural immunity or if they work remotely.

Under EO 14043, the federal government has declared that in order to be deemed to be fully vaccinated, federal employees must "receive[] the requisite number of doses of a COVID-19 vaccine approved or authorized for emergency use by the U.S. Food and Drug Administration [(FDA)] or that has been listed for emergency use by the World Health Organization." Safer Federal Workforce Taskforce, *Safer Federal Workforce: Vaccinations*, www.saferfederalworkforce.gov/faq/vaccinations/ (last visited Dec. 3, 2021). Only two weeks after the employee has taken the final dose(s) will she be considered fully vaccinated. *See id*. EO 14043 further instructs each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law." *Id*.

This mandate came as a surprise because until that time, the federal government's consistent position had been that it lacked any authority to impose vaccines on federal employees.[2] The President admitted the same day that he issued EO 14043 that his

---

[2] Jen Psaki, Press Briefing by Press Secretary Jen Psaki , BRIEFING ROOM (July 23, 2021), https://tinyurl.com/52ru4fut; Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?,* NEWSWEEK (Sept. 10, 2021), https://tinyurl.com/37z7p8y5.

"patience [with unvaccinated Americans] is wearing thin."[3] That same day, he also commanded federal contractors' employees to get vaccinated, *see* Exec. Order No. 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*, 86 Fed. Reg. 50985 (Sept. 9, 2021) ("EO 14042").

The Safer Federal Workforce Task Force ("SFWTF"), a group created by President Biden, adds that the single dose (as opposed to double dose) regimen depends on which shot a federal employee gets. *See* EO 13991, *Protecting the Federal Workforce and Requiring Mask-Wearing*, 86 Fed. Reg. 7045 (Jan. 25, 2021) (Exhibit 2). Pfizer-BioNTech, Moderna, and AstraZeneca/Oxford are two-dose series while Johnson & Johnson's Janssen COVID-19 vaccine is a one-dose vaccine. Safer Federal Workforce, *supra*. Federal employees are required to have been vaccinated by November 22 of this year.

Numerous federal employees, including all of the individual Plaintiffs, are subject to this vaccine mandate. Individual Plaintiffs, who are members of the Oklahoma Air National Guard ("Oklahoma ANG"), protect the national security of the United States and the security of the State of Oklahoma. Several of them have served honorably for decades. One of them retired because this vaccine mandate forced her out of a job she loved performing in the service of her beloved State of Oklahoma and her Nation. Other Plaintiffs too do not want to take the COVID-19 vaccine for religious and/or secular reasons.

The federal government is imperiling the State of Oklahoma's ability to protect itself, its territory, and its citizens. *See* Jennifer Steinhauer, *The U.S. Army secretary to*

---

[3] President Joseph R. Biden, Jr., Remarks by President Biden on Fighting the COVID-19 Pandemic, BRIEFING ROOM (Sept. 9, 2021), https://tinyurl.com/3ky6c3rt.

*National Guard members who resist the vaccines: Prepare for discipline*, N.Y. TIMES, Nov. 18, 2021, https://www.nytimes.com/2021/11/18/world/national-guard-army-vaccine.html [hereinafter Steinhauer] ("The secretary of the Army has issued a memo warning the hundreds of thousands of soldiers in its National Guard that if they decline to get vaccinated against the coronavirus, they may not be renewed in the guard."). On November 29 of this year, the Pentagon ordered all Oklahoma National Guard members to get vaccinated.[4] The very next day, the U.S. Secretary of Defense Lloyd J. Austin, III issued a memorandum entitled *Coronavirus Disease 2019 Vaccination for Members of the National Guard and the Ready Reserve*. *See* Memorandum for Sec'y of the Mil. Serv. Chairman of the Joint Chiefs of Staff under Sec'y of Def. for Pers. and Readiness (Nov. 20, 2021) (Exhibit 3). This memorandum stated that without a vaccination (or a valid exemption), no one could "participate in drills, training and other duty conducted under [T]itle 32 … [of the] U.S. Code." *Id*. The Austin memorandum further stated that "[n]o Department of Defense funding may be allocated for payment of duties performed under title 32 for members of the National Guard who do not comply with Department of Defense COVID-19 vaccination requirements." *Id*.

## ARGUMENT

A temporary restraining order and preliminary injunction should issue if the plaintiff shows (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer

---

[4] *See, e.g.*, Ellie Kaufman & Oren Liebermann, *Pentagon denies Oklahoma governor's request and insists National Guard members must be vaccinated*, CNN (Nov. 29, 2021), https://www.cnn.com/2021/11/29/politics/pentagon-oklahoma-vaccine/index.html.

irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Here, Plaintiffs amply satisfy each of these prongs.

## I.     Plaintiffs Have Standing to Sue in Federal Court; and, in the Absence of a Preliminary Injunction, Will Suffer Irreparable Harm.

First is the threshold issue of standing. Oklahoma is owed "special solicitude" in its standing to sue in federal court. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). A State, furthermore, has standing to assert the legal rights of its residents against federal incursion under the *parens patriae* doctrine because it "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Oklahoma seeks to protect its residents' health and well-being from the mandate; thus, the State has ample standing to bring this cause of action.

A State, it is clear, may sue in federal court in its sovereign capacity when it has suffered an economic injury or is forced to deploy its resources. Economic harm inflicted on a State by federal agency action counts as irreparable injury because it cannot be rectified by monetary remedies, *see Dominion Video Satellite, Inc. v. EchoStar Satellite Corp*., 269 F.3d 1149, 1156 (10th Cir. 2001); and because the United States retains sovereign immunity in these circumstances, *see United States v. Dalm*, 494 U.S. 596, 608 (1990); *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). Furthermore, a federal action's interference with the state's exercise of its sovereign "power to create and enforce a legal code" or any other violation of its legal rights is also an injury inflicted on the State's

sovereignty and is irreparable. *Snapp*, 458 U.S. at 601; *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Deerfield Med. Ctr. v. Deerfield Beach*, 61 F.2d 328 (5th Cir. 1981). The individual Plaintiffs—Oklahoma ANG members—also have standing because their livelihoods, funding, bodily integrity, liberty, and individual autonomy are at risk of being taken from them.

Furthermore, the federal government's vaccine mandate poses irreparable and imminent harm to Plaintiffs. Oklahoma, as a sovereign state, is at risk of having her laws and public policy preferences usurped by this vaccine mandate. The mandate ensures that many Oklahoma ANG members will simply quit instead of getting the vaccine, a situation that will irreparably harm Oklahomans' safety and security. *See* Steinhauer, *supra* ("In Oklahoma, 89 percent of airmen in the Guard have been vaccinated, while only 40 percent of Army guardsmen have had shots."). The same is doubtless true in many States. It is doubtful whether Oklahoma or any State would ever be able to fully recover from this damage and, in any event, the costs of doing so would be staggering and unprecedented.

As the Secretary of Defense's memorandum of November 30 of this year as well as his position expressed on November 29 make clear, the employment of the Oklahoma Guard member Plaintiffs is also in peril. For those members who quit the Guard but are reinstated later, the loss of experience and benefits could not fully be restored. Alternatively, their rights to individual autonomy and bodily integrity as well as their right against forced medical intervention would be violated. The Guard members are therefore at imminent risk of irreparable harm from this vaccine mandate. Consequently, this Court's *immediate* intervention in Plaintiffs' favor is the only plausible recourse available to

Plaintiffs.

## II.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits because the mandate violates several statutes and constitutional provisions.

### A.    The Vaccine Mandate Exceeds the President's Statutory Authority.

#### 1.    This Mandate is Not Authorized by 5 U.S.C. § 3301.

Section 3301 permits the President to "prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the *efficiency* of that service" and to "*ascertain* the fitness of applicants as to age, *health*, character, knowledge, and *ability* for the employment sought." *Id*. (1)–(2) (emphases added). Neither of these clauses empowers the Executive to impose this vaccine mandate.

In undertaking the statutory-interpretation enterprise, courts examine the ordinary, contemporary meaning of the statute as well as the meaning of the specific words in light of the overall statutory context. *See Sandifer v. U.S. Steel Corp*., 571 U.S. 220, 227 (2014). The chief objective of that project is to determine what the statute meant to the living community at the time of its enactment, which is to say what its words "conveyed to reasonable people *at the time they were written*." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) (emphasis added).

Now we apply these principles to the first relevant clause—"promote the efficiency"—of Section 3301. First, nothing about "efficiency" in any part of the federal bureaucracy enables the President to issue a vaccine mandate. The ordinary, contemporary meaning of this provision makes short work of any contrary position. When Section 3301

was enacted in 1966, "efficiency" in the federal workforce referred to productivity and output. One prominent contemporary dictionary defined "efficiency" as "the ability to do something or produce something without wasting materials, time, or energy." *Efficiency*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ efficiency. Another did virtually the same by thus defining "efficiency": "The ratio of the effective or useful output to the total input in any system." *Efficiency*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=efficiency. "Efficiency," whether it is taken on its own terms or put into the context of Section 3301, does not concern matters such as public-health mandates or other subjects of comparable magnitude. Nor does anything in the legislative history of this provision call this inference into question. Therefore, the first clause of Section 3301 does not authorize this mandate.

If more explanation were necessary, the Major Questions Doctrine ("MQD") provides it. Under this doctrine, the Supreme Court repeatedly has insisted that courts should refrain from assuming that Congress *implicitly* has delegated questions of "'deep economic and political significance'" to the Executive Branch. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In essence, a clear statement from Congress is required before the courts will make that inference. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Executive claims about implicit congressional authorizations on matters of enormous economic and political importance are *particularly* infirm when they allege that Congress has permitted the Executive: (1) to

"intrude[] into an area that is the particular domain of state law"—a space like public health, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; SCALIA & GARNER, *supra*, at 290–94—(2) to "alter the fundamental details of a regulatory scheme," *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001); (3) to significantly affect the security of or make enormous changes to the way the federal civil service lives and works, *see generally Brown & Williamson Tobacco Corp.*, 529 U.S. at 160; or (4) to issue regulations in a space that the Constitution expressly and most carefully commits to Congress, *e.g.*, the power "to make rules for the government and regulation of the land and naval forces," U.S. Const. art. I, § 8, cl. 14 (capitalizations altered). In order to deem this mandate to be a Section 3301 delegation, this Court would have to reject *each* of those presumptions. Thus, the MQD counsels against inferring that this part of Section 3301 authorizes the mandate.

Now we come to Section 3301's second pertinent clause—"ascertain[ment]" of "the fitness of applicants." The ordinary, contemporary meaning of this provision is our lodestar. "Ascertain" concerns "find[ing]" something "out or learn[ing]" it "with certainty," not to doing anything about it. *Ascertain,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ascertain. Similarly, another dictionary contemporaneously defined "ascertain" as "To discover with certainty, as through examination or experimentation." *Ascertain,* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=ascertain. The discovery *is* the end; examination and experimentation merely are the means to achieve that objective. The mandate is unsupported by this clause of Section 3301 because here,

the Executive is not trying to find anything out about the suitability of an applicant—he is imposing a vaccine mandate on existing federal employees.

The rest of this clause revolves around the "ascertain[ment]" aspect and does not change the outcome. "Health" means what it always has meant: the well-being of the human person. And "ability" contemporaneously was defined as the "physical, mental, or legal power to do something" or the "competence in doing something." *Ability,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ability. Similarly, "ability" also referred to: "The quality of being able to do something, especially the physical, mental, financial, or legal power to accomplish something" or "[a] skill, talent, or capacity." *Ability,* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=ability. The plain meaning of this clause in Section 3301 does not authorize the mandate.

Nor does legislative history suggest anything to the contrary. And the MQD confirms this upshot because Congress has not explicitly (or implicitly) authorized the Executive to issue this mandate; and each and every single one of the aforestated MQD presumptions cuts against making a contrary inference.

### 2.	This Vaccine Mandate is Unsupported by 5 U.S.C. § 3302.

Section 3302 concerns only selection procedures for the competitive service for career civil servants in the federal government. Not only does this provision address nothing other than a process for a meritocratic federal competitive service system, but it is also confined to the President's authority to direct how that meritocracy will operate. To

be specific, Section 3302 is replete with reticulated minutiae about how the President may conduct the operation of the federal competitive service. None of this contains a whisper of Congress' delegating to the Executive the power to issue vaccine mandates.

It follows that Congress has not addressed anything akin to a vaccine mandate in Section 3302's plain text; and the President's claimed authority is without merit. Nor is there anything in the legislative history of Section 3302 to rebut this inference. Finally, the MQD confirms this upshot because Congress has not explicitly (or otherwise) authorized the Executive to issue this mandate; and—again—*each* of the aforestated MQD presumptions cuts against making a contrary inference.

### 3.    This Vaccine Mandate Finds No Support in 5 U.S.C. § 7301.

Section 7301's plain text—"The President may prescribe regulations for the conduct of employees in the executive branch"—fails to authorize this vaccine mandate. That is because nothing about EO 14043 concerns the "conduct" of federal employees. Instead, that Executive Order concerns a vaccination directive, which is a *status*. Conduct and status frequently as well as in this context are diametrically opposed to one another.

Every ordinary speaker of the English language knows now, as she would have in 1966 when Section 7301 was enacted, that "conduct" concerns behavior and activity—and is the opposite of "status." "Conduct" is centered on action, whereas "status" is centered on the state of being. "Conduct" contemporaneously was defined as "to plan and do (something, such as an activity)." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conduct. Another reputable dictionary defined "conduct," in

relevant part, as "[t]he way a person acts." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=conduct. Conversely, "status" contemporaneously was defined as "state or condition with respect to circumstances." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/status. Another dictionary defined "status" as "[p]osition relative to that of others; standing" and as "[t]he legal character or condition of a person or thing." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=status.

Had Congress wanted to authorize Presidential control over the federal workforce's "status," instead of over its "conduct," Congress would have had little difficulty in making that substitution. *See*, *e.g.*, *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 104–05 (1993); *In re Generation Res. Holding Co., LLC*, 964 F.3d 958, 968 (10th Cir. 2020). But there are numerous reasons that a vigilant or even a rational Congress would not want to thus empower a potentially trigger-happy Executive. Enabling Presidents to govern federal employees' status would have vastly empowered Presidents to apply egregiously exclusionary criteria to employees that Congress might have deemed unacceptable. The 89th Congress, it safely can be inferred, would not lightly have wanted to hand all its chips over to the Executive to do as the latter wished to federal employees.

The Supreme Court has cautioned other tribunals that "differences in language" ordinarily convey "differences in meaning." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018). "[I]t is not [the judicial] function"—in fact, it is a breach of that function—to "treat alike subjects that ... [Congress] ha[s] chosen to treat differently." *West*

*Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991). Executive Branch practice also supports Plaintiffs' understanding that "conduct" exclusively means behavior and actions. Historically, under Section 7301, Presidents have issued executive orders concerning *conduct* such as: smoking on federal property, *see* Exec. Order No. 13058, *Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace*, 62 Fed. Reg. 43451 (Aug. 9, 1997) ("EO 13058"); the taking of drugs by federal employees, *see* Exec. Order No. 12564, *Drug-Free Federal Workplace*, 51 Fed. Reg. 32889 (Sept. 15, 1986) ("EO 12564"); the solicitations and acceptances of gifts by federal employees, *see* Exec. Order No. 12674, *Principles of Ethical Conduct for Government Officers and Employees*, Apr. 12, 1989, 54 Fed. Reg. 15159, *as amended by* Exec. Order No. 12731, 55 Fed. Reg. 42547 (Oct. 17, 1990) ("EO 12674"); and domestic violence, *see* Presidential Memorandum: *Establishing Policies for Addressing Domestic Violence in the Federal Workplace*,  77 Fed. Reg. 24339 (Apr. 18, 2012). Of course, none of these subject matters pertains to status—only to conduct. Nor can refusal to engage in certain actions, like taking a vaccine, be considered conduct. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549–61 (2012). EO 14043 stands alone among these EOs.

The MQD too cuts against the vaccine mandate. This mandate is of enormous economic and political significance, which means Congress needed to have spoken clearly. Congress has not done so. On top of that, this mandate destabilizes the federal-state balance; upends the way that civil service, not to mention public-health mandates, work; turns upside-down Americans' lives; and pretends that Congress surrendered its constitutional power to make rules concerning the military. *See BST Holdings LLC v.*

*OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). It follows that this statutory basis claimed by the Executive is unavailing. In fact, Congress never empowered him on *any* statutory basis to impose this mandate.

**B.     The Mandate Violates the Administrative Procedure Act ("APA").**

In two ways, Defendants have also violated the APA. First, under the APA, a court is required to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). As discussed, Defendants' vaccine mandate exceeds the bounds set by Congress in 5 U.S.C. §§ 3301, 3302, and 7301. Therefore, this mandate is not in accordance with law and exceeds the authority Congress has afforded the Executive Branch. This mandate, accordingly, violates the APA. But that is not all.

The mandate violates the APA in another way as well. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The question is whether the SFWTF or any of the other agencies acted "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate," *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015), and does not consider the natural immunity of the federal employees subjected to this mandate. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("… an agency rule would be arbitrary and capricious if the agency has relied on factors

14

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

The Supreme Court has noted that reviewing courts evaluating the lawfulness of agency actions should consult "'the grounds that the agency invoked *when* it took the [challenged] action.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (emphasis added) (quoting *Michigan*, 576 U.S. at 758); *id*. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted."). It is clear that the Executive did *not* "examine[] the relevant data" or "articulate[] a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (cleaned up).

The injuries inflicted by this mandate on Oklahoma and her sister States or the other Plaintiffs are not mentioned, much less explained, in the mandate or the attendant administrative record. Defendants have also failed to explain their departure from prior practice, contrary to the APA's command. This mandate has deviated from the Executive Branch's prior policy "without any consideration whatsoever" of a less drastic or extreme measure. *State Farm*, 463 U.S. at 51. Such an "unexplained inconsistency" is fatal. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). This failure was inexcusable in *Regents* and in *State Farm*; and it should be inexcusable here. Even if Defendants were to devise, albeit *post hoc*, some argument that they had a previously overlooked statutory duty to impose this vaccine mandate, that still would not

15

get them over the finish line. As the Supreme Court took care to point out in *Regents*, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program" carrying sweeping ramifications. *Regents*, 140 S. Ct. at 1910. This vaccine mandate is just such a policy.

Moreover, Defendants have neither accounted for Oklahoma's sovereignty, laws, reliance interests, costs, and other factors nor considered the injuries this mandate inflicts on individual Plaintiffs nor, for that matter, contemplated lesser alternatives—each of which renders Defendants' policy arbitrary and capricious. *See id.* at 1913. Other non-exhaustive considerations also indicate that this mandate is arbitrary and capricious:

a. Defendants' failure to consider the mass exodus of unvaccinated federal employees, including those defending our Nation in the military and the National Guard, in our current economy that is already facing a vast dearth of labor, inflation, and supply-chain challenges;

b. Defendants' failure to consider the legal claims and factual assertions made in this Complaint as well as in the parallel lawsuits filed to challenge this vaccine mandate;

c. Defendants' decision to impose different vaccination deadlines for Air National Guard and Army active-duty service members (as well as other disparate vaccination deadlines within the federal government);

d. Defendants' failure to exempt those who work remotely in a way that renders them unlikely to catch or spread COVID-19; and

e. Defendants' failure to mention, much less explain or resolve, a core paradox at the heart of all their vaccine mandates. As Judge Doughty recently wondered aloud: "If boosters are needed six months after [a person supposedly is] 'fully vaccinated,' then how good are the COVID-19 vaccines, and why is it necessary to mandate them?" *Louisiana v. Becerra*, Case No. 3:21-CV-03970, 2021 WL 5609846, *13 (W.D. La., Nov. 30, 2021). It begs the question—why not a less drastic alternative?

"Reasoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action. What was provided here was" at best "more of a distraction" and at worst conclusory. *Dep't of Commerce*, 139 S. Ct. at 2576. Consequently, this mandate is arbitrary and capricious in violation of the APA.

### C.    The Mandate Contravenes the Tenth Amendment and Other Federalism Provisions in the Constitution.

This mandate also violates the Constitution. To illustrate, the federal government is one of limited powers and does not get to control all aspects of our lives: "[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see also* THE FEDERALIST No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003). "[A]llocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States … in part, [as] an end in itself, to ensure that States function as political entities in their own right." *Bond v. United States*, 564 U.S. 211, 221 (2011). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond I*, 564 U.S. at 222.

The Tenth Amendment, which protects the States' "residuary and inviolable sovereignty," THE FEDERALIST No. 39, at 289 (James Madison) (Clinton Rossiter ed., 2003), makes its entrance. "The powers reserved to the several States," it was understood at the Framing, "will extend to all the objects … concern[ing] the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." THE FEDERALIST No. 45, at 45. To this end, the police power, involving public *health*,

safety, and morals, is the "power which the *state* did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905) (emphasis added); *see also Printz v. United States*, 521 U.S. 898, 919 (1997).

If there is any governmental power to mandate vaccinations at all, it belongs only to the State. *See*, *e.g.*, *Zucht v. King*, 260 U.S. 174, 176 (1922). *Jacobson*, which upheld compulsory vaccinations, expressly relied on the Massachusetts law's being an exercise of *State* police powers—not a matter of federal concern. 197 U.S. at 25 ("[T]he police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.").

Now we must ask whether the President has the unilateral executive power granted in Article II of the Constitution to issue this vaccine mandate. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). The source of that power must come, if it exists at all, from the U.S. Constitution's Article II, Section 1. For our purposes, *Youngstown* is outcome-determinative. In *Youngstown*, amidst a martial conflict, the Supreme Court invalidated President Truman's unilateral effort to seize steel mills in order to elevate the speed and quantity of steel production.  His failure to obtain congressional authorization, though, meant that he had engaged in unconstitutional lawmaking. *See id*.

Issuing vaccine mandates falls well outside the President's limited Article II powers. To be sure, conducting foreign policy and advancing national security are part of the President's residual executive power—because in those spheres, he speaks for the Nation in one voice and must do so with "activity, secrecy, and dispatch," traits that trace themselves back to the Executive's "unity," THE FEDERALIST No. 70, at 472 (Alexander

Hamilton) (J. Cooke ed. 1961)—but issuing a vaccine mandate by violating State police powers, individual autonomy, and Congress' constitutional authority assuredly is not. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14–15 (2015); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003); *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting); Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power Over Foreign Affairs*, 111 Yale L.J. 231, 252–65 (2001). Our Framers inherited the Enlightenment thinkers' preference for diffusing power, *see* JOHN LOCKE, SECOND TREATISE OF GOVERNMENT §§ 143–144, at 72 (J. Gough ed. 1947); XI MONTESQUIEU, THE SPIRIT OF LAWS 151–52 (O. Piest ed., T. Nugent transl. 1949); and of committing the lawmaking function to the legislature, *see Youngstown*, 343 U.S. at 589. The President has no unilateral authority under Article II to issue a vaccine mandate. This mandate violates the Tenth Amendment and the Constitution's federalism principles.

In addition, this mandate exceeds the federal government's Commerce Clause authority, *see* U.S. CONST. art. I, § 8, cl. 3, because, under *Sebelius*, 567 U.S. at 548–61, and *United States v. Lopez*, 514 U.S. 549, 558–59 (1995), the subject matter of this mandate concerns neither the channel of interstate commerce nor instrumentalities of interstate commerce nor still does it have a substantial relation to interstate commerce. *See also United States v. Morrison*, 529 U.S. 598, 609 (2000). It is indisputable that "the power to regulate commerce, though broad indeed, has limits." *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968). "A person's choice to remain unvaccinated and forgo regular testing" is not an economic activity in the Commerce Clause sense, *BST Holdings* at 617—any more than buying health insurance was deemed to be so in *Sebelius*, 567 U.S. at 558, or having guns

near schools was deemed to be so in *Lopez*, 514 U.S. at 567. Consequently, this mandate exceeds the constitutional limitations on federal power—and is impermissible.

### D.     This Mandate Violates the Constitution's Non-Delegation Principle.

The mandate also runs afoul of the separation of powers, which does not permit Congress to delegate the momentous question of vaccine mandate to the Executive. The Supreme Court has held that "Congress" may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935). Even with legislative acquiescence, the Executive may not act unilaterally in this space. *See Paul v. United States*, 140 S. Ct. 342 (Kavanaugh, J., respecting denial of certiorari); *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in judgment); *id*. (Gorsuch, J., dissenting).

The delegation here fails because it is neither intelligible nor permissible, as Congress may not delegate away its own powers on an issue as significant as a vaccine mandate, and certainly not through the generalized delegation upon which Defendants rely. Furthermore, under our separation of powers, Congress categorically lacks the authority to delegate its constitutionally-endowed lawmaking functions to other entities.

### E.     The Vaccine Mandate is an Unreasonable Search and Seizure Under the Fourth Amendment.

This mandate also violates the individual liberties secured by our Constitution. Notably, the Fourth Amendment forbids "unreasonable searches and seizures" by the government. The Supreme Court reaffirmed that "the 'seizure' of a 'person'" may "take the form of … a 'show of authority' that 'in some way restrain[s] the liberty' of the person."

*Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Forcible vaccinations have been treated as "search[es] and seizure[s]" for Fourth Amendment purposes. *See*, *e.g.*, *B.A.B., Jr. v. Board of Educ. of City of St. Louis*, 698 F.3d 1037, 1039–40 (8th Cir. 2012) (rejecting Fourth Amendment claim on other grounds).

A "compelled intrusio[n] into the body," *Schmerber v. California*, 384 U.S. 757, 767–68 (1966), one "penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable" under the Fourth Amendment, *Skinner v. Ry. Lab. Exec. Ass'n*, 489 U.S. 602, 616 (1989). Such seizures "implicate[] privacy interests" and "concern[] … bodily integrity." *Id.* at 616–17. This vaccine mandate involves into-the-bloodstream intrusion, not just beneath-the-skin penetration. *A fortiori*, the search and seizure here is unreasonable and unconstitutional.

A private entity "that complies with [the governmental demands of seizing the person of that entity's employee] does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth Amendment." *Id.* at 614. That remains true when the government "encourage[s], endorse[s], and participat[es]" in the seizure. *Id.* at 615–16. The same principle applies when the government sets unconstitutional conditions to the enjoyment of a benefit. "[T]h[is] … doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) ("*FAIR*"). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected [right] even if he has no entitlement to that benefit" in the first

21

place. *Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up).

The vaccine mandate is an unconstitutional search and seizure of the person under the Fourth Amendment. In its search and seizure of unvaccinated federal employees, it impermissibly restrains the liberty of the person. *See Torres*, 141 S. Ct. at 995; *Terry*, 392 U.S. at 19 n.16. This mandate forcibly intrudes into the physical person of the federal employee; it penetrates into her bloodstream. *See Skinner*, 489 U.S. at 616. This intrusion violates the person's privacy, autonomy, and bodily integrity. Society clearly recognizes the right to avoid such a compelled intrusion as reasonable. *See California v. Greenwood*, 486 U.S. 35, 43 (1988); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

The federal government invokes its "sovereign authority" to impose this unconstitutional seizure on federal employees, *Skinner*, 489 U.S. at 616, because it "encourage[s], endorse[s], and participat[es]" in this seizure of the individual, *id*. at 615–16. Through this mandate, it also sets unconstitutional conditions on the employees' ability to stay employed. *See FAIR*, 547 U.S. at 59. It is immaterial whether those employees had any legal right to such employment in the first place. *See Umbehr*, 518 U.S. at 674. As a consequence, the mandate violates the Fourth Amendment.

**F.      The Mandate Violates the President's Obligation to Faithfully Enforce the Constitution As Well As the Laws Congress Has Enacted, Under the Separation of Powers and the Take Care Clause of the U.S. Constitution.**

The mandate also violates other constitutional provisions. Even before our Constitution's Framing, colonists were troubled by the British Crown's tendency to neglect enforcing laws that the Crown did not like as well as to claim authority that the Parliament

never had committed to the Crown. *See* MICHAEL W. MCCONNELL, THE PRESIDENT WHO WOULD NOT BE KING: EXECUTIVE POWER UNDER THE CONSTITUTION 118 (2020). Regarded as the "dispensing power," it repulsed adherents of the rule of law as well as everyday colonists. By ensconcing the separation of powers into our Constitution, the Framers repudiated this executive tendency to selectively enforce the laws. And the Constitution's requirement that the President must "'take care that the laws be faithfully executed'" also "means that [he] is not permitted to dispense with or suspend statutes." *Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) (quoting MICHAEL STOKES, ET AL., THE CONSTITUTION OF THE UNITED STATES 317 (Robert C. Clark et al. eds., 2d ed. 2013)); *see also* U.S. Const. art. II, § 3.

Numerous opinions of the Supreme Court and statements by individual Justices confirm this principle. *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2228 (2020) (Kagan, J., concurring in part) ("[T]he provision—'he shall take Care that the Laws be faithfully executed'—speaks of duty, not power."); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982) ("The Constitution imposes on the President the duty to take Care that the Laws be faithfully executed.") (cleaned up); *Myers v. United States*, 272 U.S. 52, 117 (1926) (noting Presidential "duty expressly declared in the third section of the article to take care that the laws be faithfully executed.") (cleaned up); Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1911 (2014) ("To be sure, the President has the duty to take care that the laws be faithfully executed.").

Defendants are obligated to conform to 5 U.S.C. §§ 3301, 3302, and 7301 and the

APA. By acting outside his statutory authority and by violating the Constitution, the President is also violating the separation of powers and the Take Care Clause.

All in all, Plaintiffs are more than likely to succeed on the merits of their Complaint.

## III.   The Balance of the Equities as well as the Public Interest Counsel in Favor of Preliminary Injunction Here.

Both the equities and the public interest favor an injunction here. "Forcing federal agencies to [always] comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994). "[E]ven in a pandemic, the [laws] cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Additionally, "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). It also is "against the public interest to force a person out of a job." *Vencor, Inc. v. Webb*, 829 F. Supp. 244, 251 (N.D. Ill. 1993). Enabling a State to "implement[]" its "duly enacted state statute" is of paramount public interest. *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957–58 (8th Cir. 2017).

## IV.   Under Rule 65, No Bond Should Be Required Here.

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A trial court has "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d

1202, 1206 (10th Cir. 2003) (cleaned up). No bond should be required here.

## CONCLUSION

The Court should temporarily restrain and preliminarily enjoin Defendants from enforcing, implementing, or giving any effect, in the State of Oklahoma, to EO 14043, the consequent SFWTF guidance, or agency action. Specifically and moreover, the Court should temporarily restrain and preliminarily enjoin Defendants from withholding federal funding from the Oklahoma National Guard or its members or depriving them of any of their usual rights and privileges.

<div style="margin-left:40%">

Respectfully submitted,

_s/ Mithun Mansinghani_
Mithun Mansinghani
_Solicitor General_
OFFICE OF THE ATTORNEY GENERAL
OF THE STATE OF OKLAHOMA
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Mithun.mansinghani@oag.ok.gov

Gene C. Schaerr*
H. Christopher Bartolomucci*
Riddhi Dasgupta*
Brian J. Field*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com

</div>

sdasgupta@schaerr-jaffe.com
bfield@schaerr-jaffe.com
* *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs The State of
Oklahoma; J. Kevin Stitt, Governor of
Oklahoma; John M. O'Connor, Attorney
General of Oklahoma; and 16 Oklahoma
Air National Guard Members*

Dated: December 3, 2021