## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-21-1136-F |
| | ) | |
| JOSEPH R. BIDEN, JR., in his offi- | ) | |
| cial capacity as President of the United | ) | |
| States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.  INTRODUCTION

The Governor of Oklahoma and his co-plaintiffs seek, in this action, to enjoin the implementation of Department of Defense directives mandating the vaccination of members of the Oklahoma National Guard and the Oklahoma Air National Guard against COVID-19.[1]

The vaccine mandate to which the Governor objects is the one–in addition to the nine that already apply to *all* service members–intended to protect service members from the virus which has, in less than two years, killed more Americans than

---

[1] It is clear from the complaint and the amended complaint that the claims asserted by State of Oklahoma and its Governor encompass both the Oklahoma National Guard and the Oklahoma Air National Guard.  Consequently, in this order, the Oklahoma National Guard and the Oklahoma Air National Guard will be referred to collectively and without differentiation simply as "the Guard," except where clarity or the context otherwise requires.

have been killed in action in all of the wars the United States has ever fought.[2] The court is required to decide this case on the basis of federal law, not common sense. But, either way, the result would be the same. The claims asserted by the Governor and his co-plaintiffs are without merit. The motion for preliminary injunction will be denied.

This action was filed on December 2, 2021, on behalf of the State of Oklahoma, Governor J. Kevin Stitt, Oklahoma Attorney General John M. O'Connor, and sixteen Oklahoma Air National Guard members who seek to proceed anonymously. A motion for temporary restraining order and preliminary injunction was filed on December 3, 2021. Doc. no. 9 (herein: motion). At a status and scheduling conference held on December 13, 2021, the court informed counsel that the issues presented by the motion would be addressed by way of consideration of entry of a preliminary injunction and not via the request for a temporary restraining order. Defendants have responded to the motion, doc. no. 37, and plaintiffs have replied.[3] Doc. no. 39. The motion has been fully briefed and is ripe for determination. The dispositive facts are adequately established in the record. Consequently, an evidentiary hearing is not necessary.

As an initial matter, the court will note that the complaint, as filed on December 2, 2021 focused entirely on Executive Order 14043,[4] which applies to federal civilian employees. The Executive Order does not apply to service members in the

---

[2] COVID-19 has killed more than 800,000 Americans. Doc. no. 37-5, at 3. According to the Department of Veterans Affairs, fewer than 700,000 American service members have been killed in action in all of the wars the country has fought since the American Revolution. <https://www.va.gov/opa/publications/factsheets/fs_americas_wars.pdf>

[3] The motion now before the court does not seek preliminary injunctive relief on the basis of Count VII (Fifth Amendment), Count IX (First Amendment) or Count X (Religious Freedom Restoration Act).

[4] Executive Order 14043, *Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*, The White House (September 9, 2021), doc. no. 9-1.

Guard or otherwise.  An amended complaint, challenging–for the first time–the military vaccine mandate as applied to the Guard, was filed on December 27, 2021. Doc. no. 38.  Plaintiffs' Reply, also filed on December 27, 2021, addresses–for the first time–the statutory provisions which are decisive in this action, namely the statutes creating the Guard and providing for its governance.  Plaintiffs also filed a motion for protective order on December 27, 2021, doc. no. 40, seeking authorization for the sixteen individual plaintiffs to proceed anonymously.

## II.  PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is "the exception rather than the rule." United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc., 883 F.2d 886, 888 (10th Cir. 1989).  Because it is "an extraordinary remedy, the right to relief must be clear and unequivocal." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation marks and citation omitted). To obtain a preliminary injunction, the movant bears the burden of establishing four factors: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." Republican Party of N. M. v. King, 741 F.3d 1089, 1092 (10th Cir. 2013). Where the federal government is the opposing party, these last two factors merge.  Nken v. Holder, 556 U.S. 418, 436 (2009) (third factor described as "harm to the opposing party").  But where a movant fails to establish a likelihood of success on the merits, it is unnecessary to address the remaining requirements for a preliminary injunction.  Warner v. Gross, 776 F.3d 721, 736 (10th Cir. 2015).  For preliminary injunction purposes, the required showing on the

"merits," includes "not only substantive theories but also establishment of jurisdiction." Electronic Privacy Info. Ctr. v. U. S. Dep't of Commerce, 928 F.3d 95, 104 (D.C. Cir. 2019) (internal quotation marks and citations omitted).

## III.   SUBJECT MATTER JURISDICTION

Before addressing the preliminary injunction factors, the court must resolve two issues which bear on its subject matter jurisdiction–the inclusion, as plaintiffs, of individuals who wish to proceed anonymously, and standing.

a. Anonymous individual plaintiffs.

The complaint and the amended complaint refer to sixteen individual Oklahoma Air National Guard members as plaintiffs.  But those sixteen individuals are not named in those pleadings; they seek to proceed anonymously.

"The Federal Rules of Civil Procedure 'make no provision for suits by persons using fictitious names or for anonymous plaintiffs.'"  United States ex rel. Little v. Triumph Gear Systems, Inc., 870 F.3d 1242, 1249 (10th Cir. 2017) (quoting Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs, 886 F.2d 1240, 1245 (10th Cir. 1989)).  Indeed, Rule 10(a), Fed. R. Civ. P., requires "[t]he title of the complaint [to] name all the parties[.]" Although the Tenth Circuit has recognized that "[i]n certain limited circumstances," a plaintiff may be permitted by the district court to proceed anonymously, Gibbs, 886 F.2d at 1245, it has determined that the plaintiff must make a "request to the district court for permission to proceed anonymously[.]" Id.  Absent permission, the district court lacks "jurisdiction over the unnamed parties, as a case has not been commenced with respect to them." Id. (footnote omitted); see, W.N.J. v. Yocom, 257 F.3d 1171, 1172-73 (10th Cir. 2001) (dismissing an appeal because the district court never had jurisdiction over plaintiffs who had failed to request permission from district court before proceeding anonymously).

4

In the case at bar, the sixteen unnamed plaintiffs sought permission yesterday–nearly a month after this action was filed–to proceed anonymously. Defendants will presumably respond to that motion within the time allotted by the local rules. The court will then either grant or deny permission to proceed anonymously. In the meantime, the court lacks jurisdiction to grant relief to the unnamed plaintiffs.

b. <u>Standing</u>.

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" <u>Dep't of Commerce v. New York (Census)</u>, 139 S.Ct. 2551, 2565 (2019). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Id*. at 2565. "The doctrine of standing 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong' and 'confines the federal courts to a properly judicial role.'" *Id*. (quoting <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016)).

To have Article III standing, the plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc.</u>, 578 U.S. at 338. An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted).

"[A]s the party invoking federal jurisdiction," the plaintiff "bears the burden of establishing these elements." <u>Spokeo</u>, 578 U.S. at 338. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 561. Therefore, at the preliminary injunction stage, the plaintiff must make a "clear showing" of

standing.  Lopez v. Candaele, 630 F.3d 775, 785 (9th Cir. 2010) (citing Winter v. Natural Resources Def. Council, Inc., 555 U.S. 7, 22 (2008)).

In addition to having Article III standing, a plaintiff must also have prudential standing.  "Prudential standing is not jurisdictional in the same sense as Article III standing."  Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002) (quotation marks and citation omitted).  Generally, there are three prudential-standing requirements: (1) "a plaintiff must assert his own rights, rather than those belonging to third parties;" (2) "the plaintiff's claim must not be a gener-alized grievance shared in substantially equal measure by all or a large class of citi-zens;" and (3) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."  Id. (internal quotation marks and citations omitted).

Initially, the State of Oklahoma asserts it has standing to bring suit as *parens patriae*.  The *parens patriae* doctrine allows states to bring suit on behalf of their citizens by asserting an injury to a "'quasi-sovereign' interest."  Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601 (1982).  A state's concern for the health and well-being of its residents falls within the recognized category of quasi-sovereign interests which justifies *parens patriae* standing.  Id. at 607 ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.").  The State of Oklahoma asserts that it seeks in this action "to protect its residents' health and well-being from the [vaccine] man-date[.]"  Doc. no. 9, at 5.  Nevertheless, under Tenth Circuit authority, "the State does not have standing as *parens patriae* to bring an action on behalf of its citizens

against the federal government because the federal government is presumed to represent the State's citizens." <u>Wyo. ex rel. Sullivan v. Lujan</u>, 969 F.2d 877, 883 (10th Cir. 1992); *see*, <u>Wyo. v. U.S. Dep't of Interior</u>, 674 F.3d 1220, 1232 (10th Cir. 2012) (state and county could not bring suit on behalf of local business owners); *see also*, <u>Gov't of Manitoba v. Bernhardt</u>, 923 F.3d 173, 183 (D.C. Cir. 2019) (concluding that the Supreme Court's decision in <u>Massachusetts v. EPA</u>, 549 U.S. 497 (2007), did not create an exception to the rule that States lack *parens patriae* standing to sue the federal government).  Thus, the court concludes that the State does not have *parens patriae* standing to bring this action.

In addition, the State of Oklahoma contends that it may bring suit to protect a recognized sovereign interest consisting of the "power to create and enforce a legal code."  Doc. no. 9, at 5.  "[T]he power to create and enforce a legal code" constitutes a sovereign interest.  An impediment to a sovereign interest can give the State standing to sue in federal court.  <u>Alfred L. Snapp & Son</u>, 458 U.S. at 601-02; *see also*, <u>Wyo. ex rel. Crank v. United States</u>, 539 F.3d 1236, 1242 (10th Cir. 2008) (Wyoming had standing to challenge Bureau of Alcohol, Tobacco, and Firearms' interpretation of federal firearms law because the interpretation undermined Wyoming's ability to enforce its own law).  The State of Oklahoma has not shown any federal action that interferes with its exercise of "the power to create *and enforce* a legal code."  <u>Snapp</u>, at 601 (emphasis added).  The State does not identify any state law with which EO 14043 or the military vaccine mandate interferes.

Next, the State of Oklahoma maintains that it has standing "when it has suffered an economic injury[.]  Doc. no. 9, at 5.  However, the State has not made a clear showing of how EO 14043 or the military vaccine mandate has caused, or will cause, economic injury to the State.  In its complaint, the State alleges an injury in the form of lost "State tax dollars" when federal employees lose their jobs because they choose not to be vaccinated.  Complaint, ¶ 91; amended complaint, ¶ 98.  A

loss of general tax revenue is not adequate to establish standing.  Instead, the State must show the loss of specific tax revenue.  Wyo. v. Okla., 502 U.S. 437, 448 (1992).  Neither the complaint nor the State's papers demonstrate any loss of specific tax revenues, or a loss of future tax revenue, beyond sheer speculation.  See, Wyoming v. U.S. Dep't of Interior, 674 F.3d at 1234-35 (state did not have standing because there was no evidence of a specific loss of tax revenue and assertion of future lost tax revenue was merely speculative).

The State also argues that it has standing because the Guard members' departures will deprive the State of law enforcement resources to protect itself and its citizens and will require the State to incur costs to mitigate or avoid the loss.  The State specifically points out that 89 percent of the airmen in the Guard have been vaccinated, while only 40 percent of Army guardsmen have been vaccinated.  Although defendants contend the State's claim of an adverse effect on state law enforcement is "pure speculation," doc. no. 37, at 17, the court concludes that the State has demonstrated an injury sufficient to satisfy Article III.  "'An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation omitted).  The State has sufficiently demonstrated in its papers a substantial risk of harm which would occur as a result of the involuntary separation of Guard members who are not claiming an exemption and are declining vaccination, which, in turn, "may prompt [the State] to reasonably incur costs to mitigate or avoid that harm."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n. 5 (2013).

Although the State has demonstrated an injury-in-fact, it must also show the injury "is fairly traceable to the challenged conduct of the defendant" and "is likely to be redressed by a favorable judicial decision."  Spokeo, 578 U.S. at 338.  As to EO 14043, the court concludes that the State has failed show its injury is redressable

by a favorable court ruling.[5]  Even if the court were to enjoin defendants from enforcing EO 14043, the Guard members remain subject to the separate military vaccination requirement.

The only pending motion which seeks substantive relief is the motion for a preliminary injunction, doc. no. 9.  That motion and brief make no mention of the military vaccine mandate.  (The word "military" appears only twice in plaintiffs' 26-page brief.)  The Reply, filed yesterday (with a December 31 vaccination compliance deadline looming), seeks to remedy that omission.  The court has carefully considered the new arguments set forth in the reply.  They are unpersuasive, as will be seen.  But, for purposes of determining standing, the court concludes that the State of Oklahoma has satisfied both the causation and redressability requirements with respect to the military vaccine mandate.  Moreover, the court concludes that the State of Oklahoma has satisfied the prudential requirements for standing with respect to military vaccine mandate as applied to the Guard.

## IV.   FACTS

Rule 52(a)(2), Fed. R. Civ. P., requires findings of fact in support of the court's action in granting or denying a preliminary injunction.  The record now before the court easily suffices to provide the facts which control the court's determination of the motion.[6]

---

[5] The court notes the State of Oklahoma attempts to sue Joseph R. Biden, Jr., in his official capacity as President of the United States.  Federal courts generally have "no jurisdiction of a bill to enjoin the President in the performance of his official duties" that is not purely ministerial.  Franklin v. Massachusetts, 505 U.S. 788, 802-803 (1992) (quotation marks and citation omitted).

[6] The Court of Appeals has made it clear that the normal rules of evidence do not apply when the court considers a motion for a preliminary injunction.  Heideman v. South Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  In Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. 208, 210 (D.N.M. 2005), Judge Browning directly addressed the question of the admissibility of affi-

a.  Organization of the Guard.

The organization of the Guard is not without its complexities.  A starting point is to bear in mind that Guard personnel may be governed by one (and, as to some individuals, more than one) of three titles of the United States Code:  Title 5, which applies to most federal civilian employees, Title 10, which generally applies to active duty armed forces, and Title 32, which applies to the Guard.  As relevant here, the following categories of Guard personnel should be borne in mind:[7]

Drill Status Guardsmen.  This category includes most members of the Guard, *viz.*, those Oklahomans who are known by their friends and neighbors to be, in common vernacular, in "the Guard" or in "the Air Guard."  These are the "citizen soldiers" who leave their families and civilian jobs one weekend a month and two weeks a year for training.  Their service is generally governed by Title 32.  Drill Status Guardsmen are not subject to EO 14043.  Their deadline for vaccination compliance is December 31, 2021.

Title 32 Active Guard and Reserve.  These are full-time uniformed service members who serve at the state level but are paid with federal funds for their full-time work.  Their service is generally governed by Title 32, and they are not subject to EO 14043.  Their deadline for vaccination compliance is December 31, 2021.

Military Technicians (Dual Status).  These are full-time Guard employees who, legally, have one foot in the military and one foot in the civilian world.  They

---

davits for purposes of a preliminary injunction and concluded (citing Heideman) that "[i]n deciding a request for a preliminary injunction, the court may review and evaluate the credibility of testimony, affidavits, and other evidence."  *Id.* at 210.  That said, it is natural to be cautious about relying on facts averred in affidavits or declarations under oath, where the testimony thus presented has not been subjected to the usual tests afforded by the adversary process.  The court has exercised that caution in finding the facts as set forth in this order.

[7] These findings as to the categories of Guard personnel are substantially based on the Declaration of Col. Kevin A. Mulcahy, doc. no. 37-1.

are required to maintain their military position as a condition of their employment, in consequence of which they are governed by both Title 5 (civilian employment) and Title 32 (as Guard members).  They typically have administrative, recruiting and training responsibilities.  As Guard members, they are included in the defendants' military vaccine mandate.  And as Guard members, their deadline for vaccination compliance is December 31, 2021.  The complaint and amended complaint list one anonymous plaintiff as having dual status.  Complaint, ₽ 36; amended complaint, ¶ 41.  However, declarations filed by two of the putative anonymous plaintiffs indicate that they have dual status.  Doc. nos. 31 and 32.

Title 5 Civilian Employees.  These individuals are federal civilian employees working in, and for, Guard units. They are included in EO 14043 and were required to comply with vaccination requirements by November 22, 2021.  Unless they also, incidentally, are Guard members (*i.e.*, have dual status, as discussed above), they are not subject to the military vaccine mandate.  As is discussed elsewhere in this order, it is not at all clear that this action is intended to challenge the enforceability of the executive order as applied to individuals who are not Guard members and whose *only* connection with the Guard is Title 5 civilian employment.

Title 10 Active Duty Members.  These individuals are active duty Guard members who are nevertheless subject to direct federal control under Title 10, which generally applies to the armed forces of the United States.  For the Oklahoma National Guard, this includes the United States Fiscal and Property Officer.  They are subject to the vaccination compliance deadlines set by their respective services (*e.g.*, November 2, 2021 for the Air Force, December 15, 2021 for the Army).

_____

The Guard is an indispensable component of what military leaders call the total force.  The Army National Guard of the United States and the Air National

Guard of the United States are, by statute, among the "reserve components" of the armed forces.  10 U.S.C. § 10101.   "The purpose of each reserve component is to provide trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency, and at such other times as the national security may require, to fill the needs of the armed forces whenever more units and persons are needed than are in the regular components."  10 U.S.C. § 10102.

Because of the availability of the Guard for emergency response, Guard units and their members can be, and have been, deployed domestically with little or no notice.  Other deployments, usually overseas, have been ordered with longer notice. Since September 11, 2001, more than 30,000 Oklahoma Guard members have deployed to more than sixteen countries in Europe, the Middle East, Africa and the Pacific, with the majority of the deployments to Afghanistan and Iraq.[8]  It is also noteworthy here that, in some states, the Guard has been called on extensively to provide medical support to the civilian population throughout the pandemic.[9]  This has included testing of prison inmates, Howell v. Walrath, 2021 WL 5881803, *2 (E.D. Va. Dec. 10, 2021) and otherwise "assist[ing] with incarcerated individuals who had fallen ill."  Jones v. United States, 2021 WL 4264763, *3 (E.D. Mich. Sept. 20, 2021).

   b.  The Military Vaccination  Mandate.

The military COVID vaccination mandate got started with a memorandum from Secretary of Defense Lloyd J. Austin to his senior military leadership on August 24, 2021.  Doc. no. 26-2.[10]   Secretary Austin began with a statement that is

---

[8] Oklahoma National Guard website. <https://ok.ng.mil/Home/About-Your-OKGuard/>

[9] Decl. of Col. Tonya Rans, ¶ 12, doc. no. 37-5.

[10] Plaintiffs' contention, in their reply, doc. no. 39 at 1, 2 that EO 14043 provided the "impetus" for the military mandate and that EO 14043 was issued to "effectuate" that military mandate is incorrect (and, in any event, irrelevant).  The military mandate was foreshadowed in a "Message

uncontested by plaintiffs in this action (and could never successfully be contested): "To defend this Nation, we need a healthy and ready force." The Secretary found that "mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the American people." Consequently, the Secretary directed the Service Secretaries to "immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, *including the National Guard*, who are not fully vaccinated against COVID-19." (Emphasis added.) Vaccines usable to implement the mandate include only those which had received "full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance." The Secretary concluded by calling for "ambitious timelines for implementation" of the vaccination mandate. *Id.*

On November 2, 2021, Governor Stitt wrote a letter to Secretary Austin, asking the Secretary to suspend the vaccine mandate as applied to the Oklahoma Guard.[11] The Governor asserted that the "mandate violates the personal freedoms of many Oklahomans," although he intimated no basis upon which taking the COVID vaccine might be thought of as differing in some way from taking the other nine FDA-approved vaccines Oklahoma Guard members are required to take.

Secretary Austin responded to the Governor's November 2 letter by letter dated November 29, 2021. Doc. no. 36-1. Citing the President's authority over the Guard under 32 U.S.C. § 110, the Secretary expressed his view–not credibly contested by the plaintiffs in their motion or in any of the supporting materials–that to

---

to the Force" from Secretary Austin to all Department of Defense employees on August 9, 2021, a full month before EO 14043 was issued. <https://media.defense.gov/2021/Aug/09/2002826254/-1/-1/0/MESSAGE-TO-THE-FORCE-MEMO-VACCINE.PDF>  The military mandate became DoD policy on August 24, more than two weeks before EO 14043 was issued.

[11] <https://oklahoma.gov/content/dam/ok/en/governor/documents/JKS-Ltr-to-SecDef-Austin-RE-Covid19-Vaccinations_November-2-2021.pdf >

"maintain a healthy and ready military force capable of protecting the American people, the immediate vaccination against COVID-19 is an essential military readiness requirement for all components and units of the military, including the Oklahoma National Guard."  The Secretary warned the Governor that failure to follow the directions of the Service Secretaries with respect to vaccination requirements "may lead to a prohibition on the member's participation in drills and training conducted under title 32 and jeopardize the member's status in the National Guard."  *Id.*

Responding to resistance to the vaccine mandate as applied to the Guard, Secretary Austin issued a memorandum to the Service Secretaries, the Chairman of the Joint Chiefs of Staff and the Chief of the National Guard Bureau on November 30, 2021 directing them to address the failure to comply with the vaccine mandate "by members of the non-federalized National Guard who remain unvaccinated."  Doc. no. 9-3.  The Secretary made it clear that unvaccinated Guard members must be fully vaccinated "in order to participate in drills, training and other duty conducted under title 32, U.S. Code."  *Id.*  If any doubt had remained after the Secretary issued his August 24 memorandum, it is fair to say that this document, taken together with the preexisting (and long-standing) Department of Defense protocols for immunization of service members,[12] embodies the vaccine mandate at issue in this case.[13]  Implementation of the mandate as to non-federalized Guard members soon followed in the form of a directive from the Secretary of the Air Force and an Army Fragmentary Order.[14]

---

[12] *E.g.*, Army Regulation 40-562 and AFI 48-119-IP, *Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases* (Headquarters, Departments of the Army, the Navy, the Air Force and the Coast Guard, Washington, 7 October 2013) (herein: Immunization Rules).  This document has been concisely described as "the military's vaccine policy."  Doe v. Austin, 2021 WL 5816632, *4 (N.D. Fla. Nov. 12, 2021) (unsuccessful challenge to military vaccine mandate).

[13] Mulcahy decl., doc. no. 37-1, ¶ 12.

[14] Mulcahy decl., doc. no. 37-1, ¶ 13.

Guard members who fail to comply with the mandate are subject to various administrative and disciplinary actions. These include (i) disqualification from participation in drills, training and other duty, (ii) loss of pay, (iii) withdrawal of the Secretary's consent for a member to serve under Title 32, and (iv) discharge.[15]

The COVID vaccination mandate should be understood against the backdrop of other military immunization mandates–which date back as far as General George Washington's mandate that troops in the Continental Army be inoculated against smallpox.[16] Nine vaccinations (now ten, with the COVID vaccination mandate) are required for all service members.[17] This includes statutorily-designated reserve component service members such as members of the Guard.[18] And as Secretary Austin made clear in his August 24 memorandum, doc. no. 26-2, the entire gamut of exemptions potentially applicable to other vaccinations may be invoked with respect to the COVID vaccination mandate. This includes detailed provisions for medical and administrative exemptions as well as religious accommodations.[19] Disciplinary action may not be taken for refusing the vaccine while a request for exemption is pending.[20] Thus, the pendency of an exemption request is the functional equivalent

---

[15] Mulcahy decl., doc. no. 37-1, ¶¶ 14, 15, 16, 42; Declaration of Col. Charles Nichols, Jr., doc. no. 37-3, ¶¶ 11 et seq. (Air Guard). *Cf.*, Navy Seal 1 v. Biden, 2021 WL 5448970, *13 (M.D. Fla. Nov. 22, 2021) (Consequences for refusal of vaccine "might include administrative separation or discharge from the service.").

[16] Stanley Lemon et al., *Protecting Our Forces: Improving Vaccine Acquisition and Availability in the US Military*, National Academies Press (*2002*). <https://perma.cc/E545-TQ9G>

[17] Declaration of Col. Steven L. Bradley, *doc*. no. 37-2, ¶ 5.

[18] Immunization Rules, ¶ 3-2 (b). *See also*, Department of Defense, DoD Instruction 6205.02-DoD Immunization Program (July 23, 2019), p. 7, § 2.4 (requirement that "immunization policy, operational use, clinical and administrative guidance, and related plans and programs pertaining to all Reserve Component forces [be] consistent with the immunization policies of the Active Components"). Consistent with 10 U.S.C. § 10101, "Reserve Components" is defined in Instruction 6205.02 to include the Army National Guard and the Air National Guard. *Id.*, p. 18.

[19] Immunization Rules, ¶ 2-6; Bradley decl., ¶¶ 11 et seq.; Nichols decl., ¶¶ 4, et seq. (Religious Accommodation Request).

[20] Nichols decl., ¶ 7.

of a preliminary injunction.  *See,* Church v. Biden, 2021 WL 5179215, *1 (D.D.C. Nov. 8, 2021).  (There is no indication in any of the papers before the court that any of the proposed anonymous plaintiffs have sought an exemption from the vaccination mandate.)

      c.  The Effects of COVID-19.

COVID-19 has killed over 800,000 Americans.[21]  Among active-duty service members, there have been more than 209,000 new and repeat cases of COVID.[22] Since July 2021, active-duty service members who are not fully vaccinated have had a 14.6-fold increased risk of hospitalization due to COVID infection.[23]  According to the Oklahoma State Department of Health, more than 689,000 cases of COVID have been diagnosed in Oklahoma.  Oklahoma's cumulative hospitalization rate for COVID-19 amounts to nearly 1 percent of the State's population.  More than 11,000 Oklahomans have died from COVID.[24]

As has been noted, in his November 29 letter to Governor Stitt, Secretary Austin stated his conclusion, as the highest civilian official having direct responsibility for the readiness of the Nation's military forces, that compliance with the military vaccination mandate "is an essential military readiness requirement for all components and units of the military, including the Oklahoma National Guard."  The

---

[21] Rans decl., ¶ 7.

[22] Rans decl., ¶ 10.

[23] Decl. of Maj. Scott Stanley, doc. no. 37-4, ¶ 16.

[24] Oklahoma State Department of Health, *Oklahoma COVID-19 Weekly Report*, Dec. 12 - 18, 2021.  <https://oklahoma.gov/content/dam/ok/en/covid19/documents/weekly-epi-report/2021/ 2021.12.22%20Weekly%20Epi%20Report.pdf>

record before the court provides no basis upon which this court might second guess that judgment.[25]

## V. MERITS[26]

a.  <u>Statutory authorization for the defendants' actions</u>.

As has been noted, the moving brief does not cite or discuss any of the provisions of Title 10 and Title 32 which have a direct bearing on the defendants' authority to promulgate and enforce the military vaccine mandate.[27]   Some, but far from all, of the relevant statutory provisions are discussed in plaintiffs' reply.   With the benefit of that reply, the court has carefully examined the applicable authorities with a view to determining whether they grant the defendants the authority to promulgate and enforce the vaccination mandate as to the Guard (federalized or not).   The court

---

[25] Although this motion turns more on issues of constitutional and statutory authority than on questions of military judgment, it is worth noting that the courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. at 24 (quoting from <u>Goldman v. Weinberger</u>, 475 U.S. 503, 507 (1986)).  "[T]he military's decision to inoculate service members plainly involves a military function."  <u>Doe v. Austin</u>, 2021 WL 5816632, *4.

[26] Although the court has determined that the State of Oklahoma has standing, the court notes that other courts have proceeded to the merits in vaccine mandate cases even without making a definitive determination as to standing.  <u>Cf.</u>, <u>Doe v. Austin</u>, 2021 WL 5816632, *12, n. 18 (N.D. Fla. Nov. 12, 2021) (Unsuccessful challenge to military vaccine mandate: "[I]n denying preliminary injunctive relief, I have not determined that the court does have jurisdiction."); <u>Robert v. Austin</u>, No. 21-cv-2228-RM (D. Colo. Sept. 1, 2021), <u>Order</u>, doc. no. 12, at 6 (Motion for TRO against vaccine mandate: "Assuming for present purposes that Plaintiffs have standing and that at least one of their claims is justiciable, the Court finds they have failed to establish a clear and unequivocal right to a TRO as the matter now stands.").

[27] The court also notes that the Acting Oklahoma Adjutant General, Thomas H. Mancino, has filed a declaration, providing his own detailed interpretation of the laws he thought to be applicable. Doc. no. 27, filed December 15, 2021, refiled as doc. no. 36 on December 20, 2021.  General Mancino is not counsel of record in this case.  Nevertheless, the court has carefully considered the views he expressed in his declaration.  To the extent that the court's conclusions, as set forth in this order, are inconsistent with General Mancino's views of the matter, General Mancino's views are rejected.

has concluded that the defendants are acting well within the authority granted by the Constitution and laws of the United States.

### i. As to members of the Guard.

The Constitution grants to Congress the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const., art. 1, § 8, cl. 16. The Guard is the modern embodiment of "the Militia."

Until such time as a unit of the Guard is "federalized," that is, ordered into federal service by the appropriate federal authority, the Commander in Chief of the constituent units of the Oklahoma Guard (and of the Oklahoma Guard as a whole) is the Governor. 44 O.S. 2011 § 23. The executive and administrative head of the Oklahoma Guard is the Adjutant General. 44 O.S. 2011 § 21. In broad terms (and at the risk of some oversimplification as to matters not relevant here), the command authority of the Governor, the Adjutant General, and their subordinates includes such matters as recruiting, training and pressing Guard units into service when necessary within the boundaries of the state, while federal officers, not the least of whom is the President, have the authority required to ensure that the Guard, as a statutory reserve component of the U.S. armed forces, is ready to be pressed into federal service without delay, and as seamlessly as possible, in case of need. This, generally, is the allocation of responsibility and authority envisioned by the Constitution (states responsible for "Appointment of the Officers, and the Authority of training the Militia" under "the discipline prescribed by Congress") and envisioned as well by Congress, which provides substantial funding for the Guard. 32 U.S.C. §§ 106, 107.

The constitutional allocation of responsibility for Guard matters has been fleshed out by Congress.  The beginning point, understandably relied upon by the defendants, is 32 U.S.C. § 110: "The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard."  In turn, the Service Secretaries (as relevant here, the Secretary of the Army and the Secretary of the Air Force) are empowered to "prescribe such regulations as the Secretary considers necessary to carry out provisions of law relating to the reserve components under the Secretary's jurisdiction."  10 U.S.C. § 10202(a).

Apropos of the constitutional grant of power to Congress to provide for "organizing" and "disciplining" the Militia, Congress has directed that "[t]he discipline, including training, of the Army National Guard shall conform to that of the Army. The discipline, including training, of the Air National Guard shall conform to that of the Air Force."  32 U.S.C. § 501.  If the Guard fails to comply with federal standards, the President is empowered to cut off its funding: "If, within a time fixed by the President, a State fails to comply with a requirement of this title, or a regulation prescribed under this title, the National Guard of that State is barred, in whole or in part, as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law."  32 U.S.C. § 108.  If a state should find federal standards governing the *National* Guard to be too tight a fit, the state is free to establish (and pay for) its own, independent version.  32 U.S.C. § 109(c).  Oklahoma has not done so.

The upshot of all this is that, however wide-ranging the command authority of the Governor and the Adjutant General may be within the four corners of their own state (and the court does not presume to define the extent of that authority other than as is strictly necessary for present purposes), it is unmistakably clear that the intent of Congress, as expressed in the text of its enactments, is that the Guard and its members will at all events be prepared, conformably to *federal* military standards,

to be ordered into federal service, deploying alongside members of the active duty Army and Air Force, on little or no notice, anywhere in the world–which is exactly what the Oklahoma Guard and its members have done, with great distinction, on dozens of occasions.

From day one of the military vaccine mandate, the Guard was included.  Doc. no. 26-2 (Secretary Austin's Aug. 24, 2021 memorandum).  The Guard was included (i) because "[t]o defend this Nation, we need a healthy and ready force," *id.*, and (ii) because Department of Defense regulations leave no doubt that the department's vaccination protocols must, and do, apply as fully to the statutory reserve components as to the active-duty forces.  *See,* Army Regulation 40-562 and AFI 48-119-IP, *Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases* and <u>DoD Instruction 6205.02-DoD Immunization Program</u>, discussed in Part IV, above.  This, in the midst of a global pandemic, goes to the heart of "the discipline prescribed by Congress."  U.S. Const., art. 1, § 8, cl. 16.[28]

> ii. <u>As to individuals who are employed *both* as Guard members *and* as civilians</u>

Dual status Guard members who may, as civil service employees, object to EO 14043, are nonetheless subject, as service members, to the military mandate. The military mandate applies as fully to them as to any other Guard members.  *See* Part V(a)(i), above.

> iii. <u>As to Guard personnel who are employed *only* in a civilian capacity</u>

---

[28] The defendants elaborated on these authorities by citing 10 U.S.C. § 12641 as putting legal force behind the "readiness standards" of the reserve components, the point being that if a Guard member failed to meet the applicable "standards and qualifications" for retention, § 12641(a)(1), the member would be subject to removal or other adverse action under § 12641(b).  Brief in Op., doc. no. 37, at 10.  That argument appears to be legally sound, but that elaboration on the plain import of the authorities discussed in detail here seems unnecessary.

It is not completely clear from the papers before the court whether this action is intended to challenge the enforceability of the executive order as applied to individuals who are not Guard members and whose *only* connection with the Guard is Title 5 civilian employment.  (The line-up of Guard members who seek, as anonymous plaintiffs, to challenge the mandate does not include any individuals whose *only* connection with the Guard is alleged to be Title 5 civilian employment.)  Elsewhere in this order, the court concludes that the law and the facts as to the military mandate compel the conclusion that the challenge to that vaccination mandate, as applied to the Guard, is not likely to be successful.  To the extent that the issues actually placed before the court may include a challenge to EO 14043 as applied to civil service employees who are not Guard members, the court concludes that the executive order is a permissible exercise of executive authority.  The court so concludes substantially for the reasons stated in <u>Rydie v. Biden</u>, 2021 WL 5416545 (D. Md. Nov. 19, 2021) (unsuccessful challenge to EO 14043).

iv.  <u>The major questions doctrine is inapplicable</u>.

Plaintiffs invoke the major questions doctrine in support of their challenge to EO 14043.  Motion, at 8.  As is discussed in Part V(a)(iii), above, it is not clear that plaintiffs intend to challenge the executive order as applied to individuals who have no connection to the Guard other than Title 5 civilian employment.  If such a challenge is intended, plaintiffs' invocation of the major questions doctrine in support of that challenge is rejected, substantially for the reasons recently stated by the Sixth Circuit, in consolidated appellate proceedings in <u>In re: MCP No. 165</u>, __ F.4th __, 2021 WL 5989357, *6 (6th Cir. Dec. 17, 2021).

The case for application of the major questions doctrine to the military vaccine mandate–as applied to the Guard or otherwise–is even weaker.  The gist of the major questions doctrine is that an agency's regulatory action is unreasonable, and thus

unenforceable, if "it would bring about an enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization." Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 324, (2014). Ignoring considerations relating to the deference which courts should ordinarily accord to military judgments (briefly discussed elsewhere in this order), any attempt to apply the major questions doctrine to the promulgation of the military vaccine mandate fails for three fairly obvious reasons. First, adding a tenth FDA-approved vaccine to the list of nine that all service members are already required to take would hardly amount to "an enormous and transformative expansion [of the] regulatory authority" the Secretary of Defense already possesses. And, to say no more on this point, there is nothing "transformative" about a force protection measure first conceived and enforced by General George Washington when he required members of the Continental Army to be inoculated against smallpox. *See* Part IV(b), above. Second, inclusion of the Guard in the military vaccine mandate is not an expansion of anything. The Guard has been included in military vaccination mandates for a long time. *Id.* Third, even if we were to assume that the mandate is in some way novel in the sense contemplated by the major questions doctrine, it would be nothing more than a novel application of long-established and congressionally-granted administrative authority. *Id.*

    b. The Administrative Procedure Act.

The plaintiffs assert a claim under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq*. The APA provides for judicial review of final agency action. 5 U.S.C. §§ 702, 704. The plaintiffs' APA claim is directed at the actions of the President and the Safer Federal Workforce Task Force (Task Force). The Supreme Court has determined that the President is not an agency within the meaning of the APA. Franklin, 505 U.S. at 796, 800-01. And the Task Force is not an agency as "it has no 'substantial independent authority.'" Rodden v. Fauci, __ F.Supp.3d __,

2021 WL 5545234, at *3 (S.D. Tex. Nov. 27, 2021) (quoting Meyer v. Bush, 981 F.2d 1288, 1297 (D.C. Cir. 1993)).  Aside from that, the Task Force guidance is not final agency action reviewable under the APA.  Id.  Consequently, in the absence of any final agency action, the plaintiffs' APA claim cannot succeed.[29]

    c.  Constitutional limitations.

The plaintiffs invoke several constitutional doctrines in support of their motion.  Motion, at 17-24.  Their reliance on those doctrines is misplaced.  Extended discussion is not required.

### i.  The Tenth Amendment.

The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In 2010, the Supreme Court told us that "[v]irtually by definition," the powers specifically enumerated in Article I "are not powers that the Constitution 'reserved to the States.'"  United States v. Comstock, 560 U.S. 126, 144 (2010).  Thus, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."  New York v. United States, 505 U.S. 144, 156 (1992).  As discussed in Parts IV and V(a), above, the power to impose the vaccination mandate at issue here is bottomed on an express Article I

---

[29] To the extent the plaintiffs challenge the military vaccination directive under the APA, the court concludes that the plaintiffs have not shown they are likely to succeed on the merits.  The plaintiffs have failed to demonstrate the vaccination mandate is not authorized by law as discussed in this order.  In addition, they have failed to demonstrate that the agency action was arbitrary or capricious.  In so finding, the court is cognizant of the substantial deference accorded to administrative decisions, see, Dep't of Commerce v. New York, 139 S.Ct. at 2569 (2019), and that "the lack of competence on the part of the courts is marked" in the area of regulating the military.  See, Rostker v. Goldberg, 453 U.S. 57, 65 (1981); see also, Doe v. Austin, 2021 WL 5816632, *4 (finding plaintiffs had not shown a likelihood of success on the merits of their APA claim challenging the military vaccination mandate).

grant of power to Congress (*e.g.*, "to the United States," in the words of the Tenth Amendment) to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const., art. 1, § 8, cl. 16.  This express grant of power to Congress (importantly, accompanied by an equally express allocation of responsibilities between federal and state authorities) leaves no room to call the Tenth Amendment into service by default to prescribe an allocation of power the Framers omitted to expressly delineate.[30]

## ii.  Non-delegation.

Invoking the non-delegation principle (but with very little developed argument), plaintiffs argue that "the mandate also runs afoul of the separation of powers, which does not permit Congress to delegate the momentous question of vaccine mandate to the Executive."  Motion, at 20.  Again, "the mandate" plaintiffs address in this argument is EO 14043, not the military mandate (either in general or as applied to the Guard).  As discussed in Parts IV(b) and V(a)(i), above, the "delegation" of the power to regulate the armed forces, including the Guard, is express, not implied (or usurped).

The Supreme Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'"  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457,

---

[30] For the same reasons, plaintiffs' reliance on Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) as being "outcome-determinative," motion, at 18, is equally misplaced.  In Youngstown, President Truman's problem was that Congress had not authorized him to seize, by executive order, the nation's steel mills.  The President and the Secretary of Defense have no such problem–lack of statutory authorization–in the case at bar.

474–75 (2001) (quoting Scalia, J., dissenting, in <u>Mistretta v. United States,</u> 488 U.S. 361, 416 (1989)).  Onto that degree of deference, articulated in a civilian context, the court superimposes the deference due Congress when it (i) makes "Rules for the Government and Regulation of the land and naval Forces," U.S. Const., art. 1, § 8, cl. 14, (ii) determines the breadth of the discretion to be granted to the President and his military leadership in carrying out "the discipline prescribed by Congress," U.S. Const., art. 1, § 8, cl. 16, and (iii) empowers the Executive to "prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard," 32 U.S.C. § 110.  Plaintiffs' non-delegation argument is unpersuasive.

iii. <u>The Fourth Amendment</u>.

Plaintiffs argue that the "vaccine mandate is an unconstitutional search and seizure of the person under the Fourth Amendment.  In its search and seizure of unvaccinated federal employees, it impermissibly restrains the liberty of the person." Motion, at 22.  These arguments both misconceive and trivialize the Fourth Amendment.

The Fourth Amendment argument invites, first, a step back to look at the forest instead of the trees.  Service members have, for a very long time, been required (on pain of discharge for failure to comply with lawful orders) to take vaccinations deemed necessary in the interest of military readiness. Yet plaintiffs do not cite a single Fourth Amendment case questioning, or even addressing, the power of the government, as an employer (civilian or military), to require vaccinations.  That lack of supporting authority is unsurprising.

A governmental action alleged to constitute a Fourth Amendment search is not a "search" in the sense required by that amendment unless it is "an attempt to find something or to obtain information."  <u>United States v. Jones</u>, 565 U.S. 400, 408, n. 5 (2012).  That is not this case.

25

That leaves "seizure."  Understandably, almost all Fourth Amendment "seizure" cases arise in the criminal context.  A seizure of a person, for purposes of the Fourth Amendment, occurs when "the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement."  Brendlin v. California, 551 U.S. 249, 254 (2007) (cleaned up).  Deprivation of freedom (usually freedom of movement) is the key.  Employment-related "deprivations" of freedom happen every day.  They are not coercive in the sense required by the Fourth Amendment and are not actionable as "seizures."  Guard members "are not being coerced to give up a fundamental right since there is no fundamental right to refuse vaccination."  Smith v. Biden, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021).  The result is the same with a traditional (and narrower) seizure analysis.  Plaintiffs argue that "vaccination is impossible unless a person's movement is restrained."  Reply, at 10, n. 3.  If there has been a deprivation of freedom of movement, the brevity of the encounter becomes important.  Terry v. Ohio, 392 U.S. 1 (1968).  Thus, for instance, "a routine traffic stop" is a "relatively brief encounter" which does not amount to a seizure sufficient to violate the Fourth Amendment.  Knowles v. Iowa, 525 U.S. 113, 117 (1998).  An involuntary encounter as brief as the length of time it takes to roll up a sleeve and receive a vaccination will not suffice to constitute a seizure within the traditional and fairly narrow meaning of "seizure" as that term is used in the Fourth Amendment.

The military vaccination mandate, as applied to the Guard, does not amount to a Fourth Amendment seizure.

### iv.  The Take Care Clause.

The Constitution requires that the President "take Care that the Laws be faithfully executed."  U.S. Const., art. II, § 3.  Without citing a single case finding a violation of the Take Care clause (and research by the undersigned reveals no such

case), plaintiffs argue that defendants are required to obey the law–in this instance, several civil service-related statutes–and have failed to do so.  Motion, at 23.

The obligation imposed on the President under the Take Care clause "is purely executive and political.  An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'"  State of Mississippi v. Johnson, 71 U.S. 475, 499 (1866).  Aside from that, and to the extent that the argument under the heading of the Take Care clause has any meaning at all in the context of the issues in this case, it is really nothing more than an encapsulation of all of the substantive arguments the court has already addressed and rejected in this order.  Plaintiffs' Take Care clause argument is unpersuasive.

## VI.    **THE REMAINING PRELIMINARY INJUNCTION FACTORS**

As has been noted, where a movant fails to establish a likelihood of success on the merits, it is unnecessary to address the remaining prerequisites to granting a preliminary injunction.  Warner v. Gross, 776 F.3d at 736.

That said, on the issue of whether the public interest would be served by granting an injunction, the court would be hard-put to find that the public interest would be served by entry of an order prohibiting the implementation of a vaccine mandate which adds one FDA-approved vaccine to the list of nine that all service members are already required to take–that tenth vaccine being the one which has been shown to be remarkably effective in mitigating the effects of the pandemic which has affected millions of Americans, including thousands of service members.  On that score, the court agrees with Judge Kolar-Kotelly's conclusion, in her recent decision declining to enjoin the military vaccination mandate, that "the public's interest in

27

military readiness outweighs the interests claimed by the Plaintiffs." <u>Church v.</u> <u>Biden</u>, 2021 WL 5179215, *18.

## VII.   **<u>CONCLUSION</u>**

The Oklahoma Adjutant General asserts, with the concurrence of the Governor, that, with the vaccine mandate, "the Executive Branch are aggressively encroaching on the sovereignty, laws, public policy, and resources of the State of Oklahoma." Doc. no. 36, at 6. This bespeaks a fundamental misapprehension as to the allocation of authority over the Guard as a specifically-designated reserve component of the armed forces of the United States.

The court has carefully considered the relevant constitutional, statutory and regulatory authorities and has concluded, quite readily, that the military vaccination mandate is valid and enforceable as applied to the Guard and that, consequently, the Governor and his co-plaintiffs have not demonstrated a likelihood of success on the merits. The motion for preliminary injunction, doc. no. 9, is accordingly **DENIED**.

Having denied the motion, the court cannot but note the potential consequences, for individual Guard members, of failure to comply with the vaccine mandate. Those consequences range (among other possibilities) from loss of periodic pay to involuntary separation from the Guard. Loss of one or two paychecks is one thing, serious though that may be in individual cases. What the court cannot ignore is the potentially devastating effect of involuntary separation (either as a result of direct action or as a result of continuing loss of pay), especially where, as appears to be the case here, the individual non-compliant Guard members did not have the benefit of well-informed leadership at the highest level of the Oklahoma Guard. The court strongly urges the defendants to give every consideration to providing a brief grace period–to facilitate prompt compliance with the vaccination mandate–before

directly or indirectly taking action which would end the military careers of any Oklahoma Guard members.

Dated this 28th day of December, 2021.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


21-1136p006.docx